*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0312P (6th Cir.)
File Name: 03a0312p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: JON REY HURTADO and
DENISE HURTADO,

                     *Debtors.*

_____

CHARLES J. TAUNT,

          *Plaintiff-Appellee,*

    *v.*

BARBARA HURTADO,

       *Defendant-Appellant.*

No. 02-1187

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-74374—Gerald E. Rosen, District Judge.

Argued: July 31, 2003

Decided and Filed: August 28, 2003

Before: DAUGHTREY, MOORE, and SUTTON, Circuit
Judges.

_____

### COUNSEL

**ARGUED:** Mark H. Shapiro, STEINBERG & SHAPIRO, Southfield, Michigan, for Appellant. Joseph J. Bernardi, KASIBORSKI, RONAYNE & FLASKA, Detroit, Michigan, for Appellee. **ON BRIEF:** Mark H. Shapiro, STEINBERG & SHAPIRO, Southfield, Michigan, for Appellant. Joseph J. Bernardi, KASIBORSKI, RONAYNE & FLASKA, Detroit, Michigan, for Appellee.

_____

### OPINION

_____

KAREN NELSON MOORE, Circuit Judge. The defendant Barbara Hurtado appeals the district court's decision granting summary judgment against her, in favor of the Trustee Charles Taunt. Barbara Hurtado ("Hurtado"), the mother of debtor Jon Rey Hurtado, was the recipient of a fraudulent conveyance made by her son and her daughter-in-law, debtor Denice Hurtado. The Hurtados eventually filed for Chapter 7 bankruptcy protection in 1998.

On appeal, Barbara Hurtado claims that she was not an "initial transferee" from whom the Trustee could recover a fraudulent conveyance under 11 U.S.C. § 550, because she only distributed the funds according to the desires of the debtors. She therefore claims to be a "mere conduit" for the funds, lacking the requisite legal dominion over the funds sufficient to be considered an initial transferee.

The bankruptcy court agreed with Barbara Hurtado and rendered summary judgment in her favor. The district court reversed and granted summary judgment in favor of the Trustee. We **AFFIRM** the district court's judgment.

## I. BACKGROUND

Jon Rey Hurtado (sometimes referred to as Jon Rey) and Denice Hurtado, who are married, are the debtors in this case. They filed for Chapter 7 bankruptcy protection on September 9, 1998. Their debts were discharged on December 15, 1998. The plaintiff in this case is Charles J. Taunt, the Trustee in the underlying bankruptcy proceeding. The defendant, Barbara Hurtado, is the mother of debtor Jon Rey Hurtado.

In the early 1990s, the two debtors incurred significant financial obligations to various creditors. The creditors included Comerica Bank, which obtained a judgment on June 12, 1992, against the debtors in the amount of $87,752.77, and the IRS, which was owed roughly $110,000 for taxes evidently dating back to 1990. Smaller debts were owed to the state of Michigan, Michigan National Bank, and Cigna Bank.

During the time in which the debtors were incurring these debts, they received two significant blocks of income. In September 1992, the debtors sold their house and received proceeds of $83,247.93. In August 1995, the debtors settled a lawsuit against Blue Cross and Blue Shield ("BCBS") for $130,795.00. Instead of going to the debtors' creditors or into the debtors' accounts, however, the funds went immediately to Hurtado's mother, defendant Barbara Hurtado.

Barbara Hurtado deposited the checks into her savings account at TNC Credit Union. Barbara Hurtado and her husband Daniel were the only signatories on the account and had exclusive control of the funds therein.

Although the funds stayed in Barbara Hurtado's account, she spent them only at the direction of the debtors. The debtors used the funds to pay living expenses, which amounted to $4,000 a month, and to pay certain specific creditors. When the debtors needed to pay some particular living expense, they would instruct Barbara Hurtado to write

a check on their behalf. Throughout the period of this arrangement, Barbara Hurtado kept the debtors' money separate from her own and never spent any portion of it on herself. The funds from the sale of the debtors' house and the settled lawsuit against BCBS were depleted by mid-1996, two years before the debtors declared bankruptcy. Barbara Hurtado had held funds for the debtors for over three years. No consideration was given in exchange for her aid.

Although Barbara Hurtado characterizes the funds as always belonging to the debtors (and herself as a mere agent at their direction), there was, of course, a reason why the debtors insisted on having Barbara Hurtado take legal control of the money. With Barbara Hurtado legally in control of the funds, the creditors had no access to them. The funds were not, for example, listed as the debtors' assets on the 433-A form filed with the IRS by the debtors in February 1996.

There is no question that the transfer of funds was done deliberately to circumvent the creditors' rights. Jon Hurtado baldly admitted this in deposition. When asked why he gave the funds to his mother to place in her account rather than his own, Jon Hurtado responded, "Well, several reasons. Number one, I mean I've got creditors and creditors. I will just be very candid with you, you know, judgments and so forth, and I needed to survive." J.A. at 120 (Dep. Test. of Jon Hurtado). Barbara Hurtado also knew that the money was being used to pay certain creditors, for she was the individual writing checks to them.

The Trustee filed a complaint to avoid and recover the transfer of conveyances and to revoke the debtors' discharge in May 1999. The complaint was filed against the debtors as well as Barbara Hurtado. The debtors were later dismissed from the action by the bankruptcy court, and that decision was not appealed.

The bankruptcy court granted Barbara Hurtado's motion for summary judgment and denied the Trustee's summary-

judgment motion, on the ground that Hurtado was not liable under 11 U.S.C. § 550. The bankruptcy court reasoned that Barbara Hurtado never had sufficient control over the money for liability to attach; instead, she was a mere conduit of the funds. The district court reversed, finding that Hurtado was liable as an initial transferee under 11 U.S.C. § 550. The district court issued a limited remand in the case for consideration of whether the statute of limitations barred the Trustee from recovering the portion of the funds that came from the 1992 sale of the debtors' home. On remand, the Trustee quickly conceded the issue. The bankruptcy court then entered a final judgment in favor of the Trustee on November 9, 2001, in the amount of the 1995 BCBS proceeds, and the district court affirmed. Hurtado appealed to this court, raising solely the question of whether she is liable under 11 U.S.C. § 550 with regard to the BCBS proceeds.

## II. ANALYSIS

### A. Standard of Review

"In a case which comes to us from the bankruptcy court by way of an appeal from a decision of a district court, we review directly the decision of the bankruptcy court. We accord no deference to the district court's decision; we apply the clearly erroneous standard to the bankruptcy court's findings of fact, and we review de novo the bankruptcy court's conclusions of law." *Brady-Morris v. Schilling* (*In re Kenneth Allen Knight Trust*), 303 F.3d 671, 676 (6th Cir. 2002).

### B. The Power of Avoidance Under 11 U.S.C. § 544

Two provisions of the bankruptcy code are of particular importance in this case, 11 U.S.C. § 544 and 11 U.S.C. § 550. The former allows a Trustee to avoid certain types of fraudulent transfers; the latter empowers the Trustee to recover the property transferred.

The parties do not dispute that there has been a fraudulent transfer under 11 U.S.C. § 544 in this case. Section 544 "allows the trustee to step into the shoes of a creditor in order to nullify transfers voidable under state fraudulent conveyance acts for the benefit of all creditors." *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 697 n.3 (6th Cir. 1999) (quotation omitted); *see also Mason v. Young* (*In re Young*), 238 B.R. 112, 114 (B.A.P. 6th Cir. 1999).

At the time of the transfer, there were two provisions of Michigan law that potentially rendered the transfer fraudulent, namely MICH. COMP. LAWS § 566.14 and § 566.17. Section 566.14 deems fraudulent any conveyance made by an insolvent debtor without a fair consideration; Section 566.17 deems fraudulent any conveyance made "with actual intent . . . to hinder, delay, or defraud" any of a debtor's present or future creditors. MICH. COMP. LAWS § 566.14, § 566.17 (1998).[1]

The debtors do not dispute that their conveyance of the BCBS funds to Barbara Hurtado was fraudulent under Michigan law. There is no doubt either that the conveyance was made to hinder the debtors' creditors or that the debtors were insolvent and did not receive any reasonably equivalent value in exchange for the transfer to Barbara Hurtado. Because the conveyance was fraudulent under Michigan law, 11 U.S.C. § 544 vests the Trustee with the right to avoid the transfer.

---

[1]These statutes were repealed in 1998 when Michigan passed the Uniform Fraudulent Transfer Act. Nevertheless, the changes made by that Act are not material to this case. Conveyances that are made with actual intent to defraud creditors are still fraudulent under the new MICH. COMP. LAWS § 566.34(1)(a) (1999), although the "badges of fraud" are now explicitly listed in the statute, *see* § 566.34(2) (1999). Similarly, conveyances made by an insolvent debtor without reasonably equivalent value received in exchange are still considered fraudulent under § 566.35(1) (1999).

## C. The Power of Recovery Under 11 U.S.C. § 550

The disputed issue in this case is whether the Trustee can recover the improper transfer under 11 U.S.C. § 550. Although related conceptually, these two issues must be kept analytically separate. *See Suhar v. Burns* (*In re Burns*), 322 F.3d 421, 427 (6th Cir. 2003) (explaining that "avoidance and recovery are distinct concepts and processes" that "are addressed in two separate sections of the code"). Section 550 provides as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from —

    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

    (2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

    (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

    (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a) & (b) (footnote omitted). As is plain from its text, section 550(a)(1) holds initial transferees strictly liable for any fraudulent transfers they receive. *See Christy v. Alexander & Alexander of N.Y. Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 57 (2d Cir. 1997), *cert. denied*, 524 U.S. 912 (1998).

Because Barbara Hurtado received the funds directly from the debtors, it at first glance seems unquestionable that she must be considered an initial transferee and that the Trustee be allowed to recover from her. *See First Nat'l Bank of Barnesville v. Rafoth* (*In re Baker & Getty Fin. Servs., Inc.*), 974 F.2d 712, 722 (6th Cir. 1992) (explaining that "[a]n initial transferee is one who receives money from a person or entity later in bankruptcy, and has dominion over the funds"); *see also* 5 Collier on Bankruptcy ¶ 550.02[4][a], at 550-18 (15th ed. 1996) (explaining that although "[t]he Code does not define the term[] 'initial transferee' . . . [g]enerally, the party who receives a transfer of property directly from the debtor is the initial transferee").

An initial transferee must have "dominion" over the funds to be an "initial transferee" under the statute. This point was emphasized by the Seventh Circuit in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988). In *Bonded*, Michael Ryan was an insider of Bonded Financial Services and the full owner of his unrelated business, Shamrock Hill Farm ("Shamrock"). On January 21, 1983, Ryan caused Bonded to send European American Bank ("European") a check for $200,000 with a note instructing European to deposit the check in Ryan's account. European complied. Ten days later, on January 31, Ryan authorized European to apply the $200,000 to a large debt Shamrock owed European. After Bonded (and Ryan) went bankrupt, the Trustee sued European, claiming that European became the initial transferee of the funds on January 21 because it was the payee of the check from Bonded. Although European did not receive any benefit from the funds until January 31, and until that point was essentially "no different from a courier or an intermediary on a wire transfer," *id.* at 893, the Trustee argued that European (rather than Ryan) was the initial transferee. The Seventh Circuit rejected this argument, requiring that a party do more than merely touch the money before becoming a "transferee":

[W]e think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded.

*Id.* From January 21 until January 31, full control over the funds remained with Ryan, who "was free to invest the whole $200,000 in lottery tickets or uranium stocks." *Id*. at 894. In contrast, while European technically held the money, it was legally bound to follow Ryan's instructions.

The test *Bonded* created has come to be known as the dominion-and-control test, and has been "widely adopted." *See Finley*, 130 F.3d at 57-58. This court applied this test in *In re Baker & Getty*, 974 F.2d at 712. In *Baker & Getty*, Baker and Getty Financial Services ("B&G") had been formed by two individuals, Philip Cordek and Steven Medved. Cordek and one of B&G's customers, Byron Rice, received a loan of $1.1 million from First National Bank. The Bank, however, failed to secure the loan properly. It began receiving payments from B&G accounts, including one of $200,000 originating from the sale of a B&G airplane. In exchange for the airplane, B&G received a $200,000 cashier's check endorsed in blank. Cordek gave the check to Rice and told Rice to apply it to the bank-loan indebtedness. Rice tried to apply the cashier's check to the loan, but the Bank told Rice to deposit it into his account until it cleared. When the check cleared, the money was given immediately to the Bank. We rejected the argument that Rice was the initial transferee, instead holding that the Bank was the initial transferee of the cashier's check. For while it was true "that as a matter of commercial law, Rice could have applied the endorsed cashier's check to any purpose he chose . . . in law the money was not his and he was simply acting at the direction of Cordek." *Id*. at 722. The money, we held, always belonged to Cordek and not Rice, "even though as a matter of raw power, Rice could have violated his instructions and taken the

cash to a race track or a jewelry store." *Id*. It was therefore the Bank, not Rice, that was the initial transferee.

Citing *Bonded* and *Baker & Getty*, Hurtado argues that she too should not be considered an initial transferee, analogizing her situation to that of European in *Bonded* and Rice in *Baker & Getty*. Because all of her actions were taken at the direction of the debtors, Hurtado argues that she was no more than their agent, lacking the necessary dominion over the funds to be an initial transferee.[2] While as a matter of raw power, she could have absconded with the debtors' funds, she argues that the money in reality continued to belong to the debtors.

---

[2] Barbara Hurtado's brief actually makes this argument in two different ways. It first argues that Hurtado lacked the requisite dominion and control over the funds to be an initial transferee within the meaning of § 550. It then goes on to argue that even if Hurtado is an initial transferee, she should be excused from the liability § 550 imposes under principles of equity because she was a "mere conduit" for the funds.

These two arguments, however, are merely different sides of the same coin, as entities will be considered "mere conduits" if and only if they lack dominion and control over the relevant funds. *See, e.g., Christy v. Alexander & Alexander of N.Y. Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 57 (2d Cir. 1997) (joining "other circuits in adopting the 'mere conduit' test for determining who is an initial transferee"), *cert. denied*, 524 U.S. 912 (1998); *see also Bailey v. Big Sky Motors, Ltd.* (*In re Ogden*), 314 F.3d 1190, 1196 (10th Cir. 2002) ("Financial conduits are those entities that do not exercise 'dominion and control' over the funds.").

We believe the only question to be whether Hurtado is an initial transferee within the meaning of § 550. To the extent that she is exempt from liability under § 550, it is because she does not fall under the statutory definition of initial transferee; we reject Hurtado's position that equitable principles alone exempt her from the potential statutory liability in this case. *Cf. Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988) (noting that while "some courts say that an agent . . . is an 'initial transferee' but that courts may excuse the transferee from repaying using equitable powers," such analyses are "misleading" and "introduce useless steps").

We reject Hurtado's argument, finding her to be unlike the alleged initial transferees in *Baker & Getty* and *Bonded*. The results in *Baker & Getty* and *Bonded* turned on the distinction between mere possession and ownership. The parties found not to be initial transferees in both cases never had legal title to the funds; they merely possessed the funds and were acting as agents for the principals, who retained legal right to the funds. These cases stand for the proposition that a party is not to be considered an initial transferee if it is merely an agent who has no legal authority to stop the principal from doing what he or she likes with the funds at issue. *See* 5 COLLIER ON BANKRUPTCY ¶ 550.02[4][a], at 550-18, 550-19 (15th ed. 1996) (listing examples); *see also Davis v. Davenport (In re Davenport)*, 147 B.R. 172, 185-86 (Bankr. E.D. Mo. 1992) (refusing to hold a debtor's son liable as an initial transferee, because although the debtor held funds in an account with his son's name, the debtor had the authority to, and did in fact, write checks on the account without his son's consent); *Bumgardner v. Ross (In Re Ste. Jan-Marie, Inc.)*, 151 B.R. 984, 988 (Bankr. S.D. Fla. 1993) (holding a debtor's bookkeeper not to be an initial transferee when she drafted and cashed salary checks, because she was merely an agent of the business).

Barbara Hurtado here *was* given legal title to the funds. This was, in fact, the very point of the fraudulent conveyance — in order to insulate the debtors from the money (and thus from their creditors), legal title to the funds had to be turned over entirely to Barbara Hurtado. Through this mechanism, the funds could no longer be considered assets of the debtors — note that, for example, this scheme enabled the debtors to avoid listing the funds on the 433-A form they filed with the IRS in early 1996. The funds were placed in Hurtado's bank account (which the debtors could not access without going through Hurtado). With that established, Barbara Hurtado had legal authority to do what she liked with the funds; she could have invested the funds in "lottery tickets or uranium stocks." *Bonded*, 838 F.2d at 894. This fact distinguishes both *Bonded* and *Baker & Getty*, where European and Rice

had legal obligations to follow the commands of their respective principals. *See Baker & Getty*, 974 F.2d at 722 (noting that "in law the money was not [Rice's] and he was simply acting at the direction of Cordek"); *Bonded*, 838 F.2d at 893 (pointing out that "[u]nder the law of contracts, the Bank had to follow the instructions that came with the check"). Here, Hurtado was not under any legal obligation to follow the debtors' directions. The funds placed in her account were presumptively hers under Michigan law, *see Muskegon Lumber & Fuel Co. v. Johnson*, 62 N.W.2d 619, 622 (Mich. 1954) (noting "the rule that a bank deposit is prima facie the property of the person in whose name the deposit is made and that an adverse claimant must show a clear and perfect title to it"), and there has been no evidence of some formal contractual arrangement that required her to obey the debtors' commands. Even if such an arrangement existed, it would have been void because it lacked consideration, *see Yerkovich v. AAA*, 610 N.W.2d 542, 546 (Mich. 2000) (noting that "[a]n essential element of a contract is legal consideration" and voiding a contractual agreement for lack of it), and because the very purpose of the contract would have been to carry out a fraudulent conveyance illegal under Michigan law, *see Kukla v. Perry*, 105 N.W.2d 176, 183 (Mich. 1960) (noting that "where an illegal contract is involved, the court will not enforce it or grant relief thereunder"). Hurtado had control over the bank account in this case for a number of years, exercising control on many occasions to write checks on the account; she points to no legal recourse that the debtors would have had if she had chosen to use the funds to her own benefit. The fact that she did not choose to use the funds in that manner in no way undercuts the fact that she had that ability.[3]

---

[3]One case in particular is quite similar to this one and reaches the same result we reach here. This case is *718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*, 244 B.R. 290 (Bankr. E.D. Pa. 2000) ("*Blatstein I*"), *rev'd*, 260 B.R. 698 (E.D. Pa. 2001) ("*Blatstein II*"). To protect his funds from creditors, Eric Blatstein fraudulently conveyed his assets to his wife, Lori, who had engaged in no fraud or other

We believe it clear that Hurtado was vested with legal authority to do what she liked with the funds, and so we reject her argument that she was not an initial transferee. We add, however, that Barbara Hurtado's argument that she was never really given legal control over the funds runs into an additional problem — it proves far too much. To the extent that Barbara Hurtado alleges that she was never really given the funds in question, she is not merely disputing her status as an initial transferee — she is questioning whether there ever was a conveyance at all.[4] Yet Barbara Hurtado never contested the finding of a fraudulent conveyance, either in the bankruptcy or district courts, or in her appellate briefs to this court. Moreover, at oral argument, when asked whether there was a disagreement regarding whether there was a fraudulent

---

wrongdoing. *Blatstein I*, 244 B.R. at 292-93. At his direction, Lori spent all of the funds. *Blatstein II*, 260 B.R. at 705. After Blatstein declared bankruptcy, the question became whether Lori should be considered an initial transferee within the meaning of 11 U.S.C § 550. The bankruptcy court in *Blatstein* (like the bankruptcy court below in the case at bar) held that she was not an initial transferee, because she "lacked 'dominion' over the monies in question." *Blatstein I*, 244 B.R. at 303. Instead, she "was merely a pawn who used the monies deposited into her accounts where Blatstein directed her to do so." *Id.* Stating that it would make no sense for a mere pawn to be liable for Eric Blatstein's fraud, the bankruptcy court found her not to be an initial transferee. *Id.* The district court in *Blatstein* reversed, holding that Lori must be considered an initial transferee. The district court noted that "Lori clearly had the *right* to put the transferred funds to her own purpose" and held that it was irrelevant that she "may or may not have *exercised* control" over the funds. *Blatstein II*, 260 B.R. at 717. Concluding that "the 'dominion and control' test is purely concerned with rights," the district court held Lori to be an initial transferee. *Id.* at 718. For the reasons explained above, we think the reasoning of the district court in *Blatstein* more persuasive than that of the *Blatstein* bankruptcy court.

[4]In this regard, this case is quite unlike the prototypical dominion-and-control case, where a party claims it is not an initial transferee because some other party (which had legal authority over the funds) was actually the initial transferee. Here, however, Barbara Hurtado is not arguing that some other party was the initial transferee; she is claiming that there was never any transfer at all.

conveyance under Michigan law, her counsel responded, "I don't believe so, your Honor." Having admitted that there was a fraudulent conveyance under Michigan law, Barbara Hurtado cannot now argue that there was never any actual conveyance of the funds in question.

## III. CONCLUSION

For the foregoing reasons, we hold that Barbara Hurtado did have the requisite dominion and control over the disputed funds as to make her an initial transferee subject to liability under 11 U.S.C. § 550. We therefore **AFFIRM** the judgment of the district court.