NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0485n.06
Filed: August 12, 2008

No. 07-1259

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| IN RE: DARRIN FELSNER, Debtor | ) | ON APPEAL FROM THE |
| ------------------------------------------------- | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| SHEILA SOLOMON, | ) | EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| Plaintiff-Appellee, | ) | (No. 06-CV-13922) |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT FELLMY, ET AL., | ) | |
| Defendants-Appellants. | ) | |

BEFORE:    DAUGHTREY, MCKEAGUE, Circuit Judges; and GWIN, District Judge.[*]

GWIN, District Judge:

Defendants-Appellants Robert Fellmy ("Fellmy") and Michelle Middleton ("Middleton") appeal an order of the district court granting summary judgment to Plaintiff-Appellee Sheila Solomon ("Trustee"), the trustee of the Chapter 7 bankruptcy estate of Darrin Felsner ("Felsner").

For the reasons that follow, we **REVERSE** the order of the district court granting summary judgment to the Trustee and **REINSTATE** the decision of the bankruptcy court.

### I. Background

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

A. Substantive Facts

In the spring of 2001, Michelle Middleton and her then-fiancé, Darrin Felsner, decided to move from Michigan to Florida. [J.A. 339.] On July 18, 2001, Middleton sold her home in Mount Clemens, Michigan, where both parties had previously resided, and received net proceeds of $137,221.40 from the sale. *Id.* With the help of Prudential real estate agent Lisa Watson ("Watson"), Middleton found and sought to purchase for $177,500 residential property that was located at 1173 Prescott Blvd., Deltona, Florida. *Id.* Middleton planned to use the proceeds from the sale of her Michigan home towards a 50% down payment on the Florida property and to finance the remaining balance. *Id.* When Middleton applied for credit, however, her low credit score prevented her from qualifying for a mortgage. [J.A. 339-40.] Middleton and Felsner then jointly applied for credit and were turned down. [J.A. 367-68.]

Real estate agent Watson then suggested that Felsner apply alone for the mortgage because he had a higher credit score than Middleton, even though Felsner did not have the money needed for the down payment and did not wish to purchase the home. [J.A. 340.] To accomplish this goal, the real estate agent devised a plan. She suggested that Middleton execute a "gift letter," giving Felsner the $90,000 needed for the down payment on the house, and that Felsner, after obtaining the mortgage and closing on the property, then transfer title to the property to Middleton through a quitclaim deed. [J.A. 340, 368.]

On July 11, 2001, Middleton executed a boilerplate "gift letter" to Felsner. [J.A. 338.] The gift letter states, in relevant part, as follows:

I, Michelle Middleton, am the fiancé of Darrin Felsner. I will give the sum of

$90,000.00 as a gift to Darrin Felsner towards the purchase of the property located at 1173 Prescott Blvd., Deltona, FL, 32738. I certify that the above gift will be given in good faith and repayment of such gift is not required to be paid back.

*Id.* Middleton then wrote a check for $90,000 directly to the title company. [J.A. 400, 408.]

On July 19, 2001, Felsner closed on the property. Using the $90,000 from Middleton as a down payment, Felsner obtained an $88,000 mortgage on the property in his name. [J.A. 319-34.] Felsner thus became the mortgagor and owner of the property. [J.A. 335-37.] The closing agent from the title company and the real estate agent were both present at the closing and allegedly knew that Felsner intended to transfer ownership in the home to Middleton. [J.A. 387.]

That same day, Felsner executed a quitclaim deed, conveying the Florida property to Middleton. [J.A. 435.][1] The quitclaim deed stated that Felsner received $90,589.59[2] in consideration for his transfer of the property to Middleton. [J.A. 435.] Felsner, however, denies that he received any money from Middleton other than the original $90,000 for the down payment on the house. [J.A. 368; 377-78.]

In October 2001, after living together in the Florida house for several months, Middleton and Felsner ended their relationship and each independently moved back to Michigan. [J.A. 372-73, 390.] The Florida property remained in Felsner's name because Middleton had not yet recorded the quitclaim deed. [J.A. 391.] Felsner also remained liable on the mortgage for the Florida property, so he rented out the house and used this income to make the mortgage payments over the following

---

[1] During his deposition, Felsner testified that he did not execute the quitclaim deed until two days after closing. [J.A. 408.] The notorized quitclaim deed itself, however, is dated July 19, 2001. [J.A. 435.]

[2] The lower courts and parties simply refer to this amount as $90,000.00. This Court will do the same throughout the rest of the opinion.

year. [J.A. 375-77.]

On September 6, 2002, Middleton recorded the quitclaim deed for the Florida property. [J.A. 391.] At this point, Felsner stopped making mortgage payments on the property. [J.A. 376.] Middleton transferred the property to her father, Robert Fellmy, in order to avoid foreclosure due to a later lack of payments. [J.A. 369-71, 375-76.] Fellmy also assumed Felsner's obligation on the mortgage upon obtaining title to the property. In December 2002 or January 2003, the mortgagee, Ohio Savings Bank, orally informed Felsner that he was no longer responsible for the mortgage payments. [J.A. 369-71, 398.]

On December 30, 2002, Felsner filed a voluntary petition for Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the Eastern District of Michigan. [J.A. 4.]

### B. Procedural History

On December 14, 2004, Sheila Solomon, the trustee of Darrin Felsner's Chapter 7 bankruptcy estate, filed an adversary proceeding under 11 U.S.C. § 544(b)(1) against Defendants-Appellants Robert Fellmy and Michelle Middleton in the U.S. Bankruptcy Court for the Eastern District of Michigan. [J.A. 9.] With the action, the Trustee sought to avoid Felsner's transfer of the Florida property to Middleton, saying that it was a fraudulent transfer under Florida law and asking the bankruptcy court to order that the property held by Fellmy and Middleton be turned over to the bankruptcy estate. [J.A. 20-24.]

On October 27, 2005, the parties filed cross-motions for summary judgment. [J.A. 25-37, 60-73.] On August 22, 2006, the bankruptcy court determined that Felsner's transfer of the property was not fraudulent and granted summary judgment in favor of Fellmy and Middleton. [J.A. 190-96.]

On September 5, 2006, the Trustee appealed the bankruptcy court's decision to the U.S. District Court for the Eastern District of Michigan. [J.A. 197-98.] After allowing both parties to file briefs and conducting oral arguments in the case, the district court reversed the decision of the bankruptcy court on January 18, 2007. [J.A. 241-55.] The district court remanded the case for an entry of judgment in favor of the Trustee. *Id.*

On January 26, 2007, Fellmy and Middleton filed a timely notice of appeal.

## II. Legal Standard

We have previously held that "[i]n a case which comes to us from the bankruptcy court by way of an appeal from a decision of a district court, we review directly the decision of the bankruptcy court." *Taunt v. Hurtado (In re Hurtado),* 342 F.3d 528, 531 (6th Cir. 2003) (internal citation omitted). Under this standard of review, we accord no deference to the decision of the district court. *Id.* We review the bankruptcy court's findings of fact for clear error, and we conduct a de novo review of the bankruptcy court's conclusions of law. *Id.*; *see also Dery v. Cumberland Cas. & Sur. Co. (In re 5900 Associates, Inc.),* 468 F.3d 326, 329 (6th Cir. 2006) (citing *Stamper v. United States (In re Gardner),* 360 F.3d 551, 557 (6th Cir. 2004)).

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Int'l Union v. Cummins, Inc.,* 434 F.3d 478, 483 (6th Cir. 2006); *Turner v. City of Taylor,* 412 F.3d 629, 637 (6th Cir. 2005). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005).

Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Terry Barr Sales Agency, Inc. v. All-Lock Co.,* 96 F.3d 174, 178 (6th Cir. 1996) (internal quotations

omitted).

### III. Discussion

11 U.S.C. § 544(b)(1) provides that a "trustee may avoid any transfer of an interest of the

debtor in property or any obligation incurred by the debtor that is voidable under applicable law by

a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not

allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1). If a trustee can avoid a

transfer of property under this statute, then the trustee can recover the property for the benefit of the

bankruptcy estate under 11 U.S.C. § 550(a). "Essentially, this provision permits the trustee to 'stand

in the shoes' of an unsecured creditor and assert causes of action under state fraudulent conveyance

laws for the benefit of all creditors." *Lyon v. Eiseman (In re Forbes),* 372 B.R. 321, 330 (B.A.P.

6th Cir. 2007). In order to nullify a transfer under § 544(b)(1), the trustee must prove by a

preponderance of the evidence that there is "(1) [a] creditor, (2) holding an allowable unsecured

claim; and (3) a transfer of an interest of the debtor in property, (4) that is voidable under applicable

[state] law." *Id.* (internal citation omitted).

In this case, the Trustee wants to nullify Felsner's transfer of the Florida property to

Middleton under § 544(b)(1) and to recover the property for the benefit of Felsner's Chapter 7

bankruptcy estate under § 550(a). We must therefore first examine whether the Trustee is entitled

to avoid Felsner's transfer to the property to Middleton and, if she is so entitled, whether the Trustee may recover the property for Felsner's bankruptcy estate.

### A. The Ability to Avoid the Transfer Under 11 U.S.C. § 544(b)(1)

#### 1. The Existence of a Creditor Holding an Allowable Unsecured Claim and the Transfer of an Interest of the Debtor in Property

In order for a trustee to have standing to avoid a transfer under § 544(b), "the trustee must first establish that at the time of the transaction there was, in fact, a creditor in existence who was holding an unsecured claim that is allowable under 11 U.S.C. § 502." *In re Forbes,* 372 B.R. at 335 (internal citation omitted). The trustee need not "plead the existence of [an] unsecured creditor by name, though the trustee must ultimately prove such a creditor exists." *Welt v. Jacobson (In re Aqua Clear Tech., Inc.),* 361 B.R. 567, 583 n.18 (Bankr. S.D. Fla. 2007).

On July 19, 2001, when Felsner transferred the property to Middleton, numerous creditors held unsecured claims against him. Prior to moving to Florida, Felsner filled out a Uniform Residential Loan Application ("URLA"). [J.A. 316-18.] In this application, Felsner listed that he owed debts to Ford Motor Lease, Dodge Chrysler Credit, Citibank Mastercard, Aria Visa, Citizens Bank, and Visa. [J.A. 317.]

Further, the parties do not dispute the fact that Felsner's transfer of the Florida property to Middleton constitutes a "transfer of an interest of the debtor in property." We therefore conclude that the first three elements of the § 544(b)(1) test have been satisfied and now turn our attention to

the dispositive issue of whether Felsner's transfer of the property was fraudulent under state law.[3]

### 2. The Applicability of Florida's Fraudulent Transfer Statute

Defendants-Appellants Fellmy and Middleton argue that Felsner's transfer of the property to Middleton was not fraudulent under Florida law. The bankruptcy court agreed and concluded that the transfer was not fraudulent because Middleton did not intend the $90,000 that she gave Felsner to be a gratuitous gift; rather Middleton gave him the money in consideration for his near-simultaneous transfer of the title to her. The bankruptcy court thus concluded that Felsner received sufficient consideration for the transfer and denied the Trustee's summary judgment motion. In this appeal, the Trustee argues that Felsner's transfer of the Florida property was fraudulent because Felsner did not receive a reasonably equivalent value in exchange for giving title of the property to Middleton and the transfer of the property rendered Felsner insolvent.

Florida's fraudulent transfer statute states, in relevant part, the following:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
. . . .
(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
. . . .
2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

FLA. STAT. § 726.105(1)(b)(2). In order for a trustee to nullify a property transfer on the grounds

---

[3] Although the parties vaguely question in their briefs whether Florida or Michigan state law applies to the present dispute, both lower courts and the parties assumed throughout this litigation that Florida law governs this case because the property at issue is located in Florida. We therefore analyze the transaction under Florida's fraudulent transfer statute. Even if Michigan's law was applicable, our analysis would be substantially the same because both states have adopted the Uniform Fraudulent Transfer Act.

that it constitutes constructive fraud under this statute, the trustee must thus demonstrate (1) that the debtor made the transfer "without receiving a reasonably equivalent value in exchange" for his transfer, and (2) that the debtor either intended to incur debts beyond his ability to pay or "reasonably should have believed" that he would incur such debts. *Id.*

The Court will analyze whether the Trustee has proven by a preponderance of the evidence each element of the fraudulent transfer statute in turn.

*i. Existence of a Reasonably Equivalent Value*

The Florida fraudulent transfer statute does not explicitly define the phrase "reasonably equivalent value," but Florida courts "generally consider many factors, including the 'good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length.'" *Menchise v. Clark (In re Dealers Agency Services, Inc.),* 380 B.R. 608, 619 (Bankr. M.D. Fla. 2007) (citing *Bakst v. O'Connor & Taylor Dev. Corp., (In re Vilsack),* 356 B.R. 546, 553 (Bankr. S.D. Fla. 2006)). Courts must compare "what went out" and "what was received" in evaluating whether the debtor received a reasonably equivalent value in exchange for his property transfer. *Id.* (internal citation omitted).

In this case, the Trustee asserts that Darrin Felsner did not receive a reasonably equivalent value in exchange for transferring title of the Florida property to Michelle Middleton. Even though the quitclaim deed states that Felsner received $90,000 in consideration for the transfer, the Trustee says that Felsner in reality received nothing of value from Middleton. The Defendants-Appellants claim, and the bankruptcy court found, that Felsner did indeed receive sufficient value for his property transfer because the $90,000 that he received from Middleton was not a gratuitous transfer

as stated in the "gift letter," but rather was consideration for his subsequent execution of the quitclaim deed transferring title to Middleton. In this appeal, Fellmy and Middleton must show that the $90,000 was intended to be consideration for the later exchange and not a true gift in order to prove that Felsner received sufficient value for his transfer of the property to Middleton.

In order to prove that a transfer is a valid inter vivos gift under Florida law, a plaintiff must show that there was "(1) an intention of the donor to transfer a present interest, (2) delivery by surrender of dominion and control to the donee, and (3) acceptance of the gift by the donee." *Green v. Green,* 314 So.2d 801, 802 (Fla. Dist. Ct. App. 1975). *See also U.S. v. Viomar Co.,* 616 F.Supp. 24, 26 (S.D. Fla. 1985). A donor must possess the intent to transfer a present interest to a donee in order for the transfer to be considered a valid inter vivos gift under Florida law. Here, Middleton admittedly did execute, under the guidance of her real estate agent, a "gift letter" in which she stated that she intended to give Felsner $90,000 and that this gift "will be given in good faith and repayment of such gift is not required to be paid back." [J.A. 338.] The Trustee places significant emphasis on this language of the gift letter and argues that Middleton made a valid inter vivos gift to her then-fiancé Felsner.

In considering the totality of the circumstances, however, we find that Middleton lacked the donative intent to give Felsner an unconditional gift of $90,000. Both Middleton and Felsner admit that neither of them intended that Felsner keep the money. In describing his understanding of the gift letter, Felsner testified during his deposition:

> Q: And [the gift letter] was to establish that you were now the owner of the $90,000.00?
> A: It was to establish where the $90,000.00 came from.

> Q: Okay. But, it was a gift from transferring her interest to you, as far as the gift letter?
> A: Yes.
> Q: So, it was portrayed that she was literally being a wonderful human being --
> A: And giving me 90 grand.
> Q: – and giving you 90 grand, and probably giving up any interest in it?
> A: Yes.
> Q: And that was her understanding and your understanding of what the gift letter says?
> A: As long as I was willing to sign the Quit Claim Deed after the closing.

[J.A. 385-86.]

Middleton also states in her affidavit that she signed the gift letter "with the understanding that I would gift the down payment to Felsner, and Felsner would quit claim the property to me simultaneously with closing." [J.A. 340.] Felsner repeatedly testified as to his role as a straw man in the transaction; he merely intended to serve as a conduit for Middleton to obtain the home she wanted in Florida. Felsner testified that he was "just a pig in a blanket just helping [Middleton] out" during this series of events. [J.A. 379.]

The record reflects that the parties intended a single transaction with two parts: first, Middleton would provide Felsner with the money required for the down payment, and, second, upon closing, Felsner would quitclaim the property to Middleton. The language of the gift letter actually references the singular nature of the transaction that the parties intended as well. Middleton's gift letter explicitly states that she "will give the sum of $90,000.00 as a gift to Darrin Felsner *towards the purchase of the property* . . ." [J.A. 338.] (emphasis added). The qualifying conditional language of the gift letter indicates that Middleton did not intend for the "gift" of $90,000 to be an unconditional transfer of her present interest in the money to her fiancé; rather, the gift letter reflects

Middleton's desire for Felsner to use the money in furtherance of their plan by which she would obtain title to the house.[4]

In fact, Felsner never even received the money by which he was to make the down payment on the Florida property. In his deposition, Felsner testified that Middleton "had the check over-nighted from Michigan to Florida. So, me actually ever seeing the check, I don't recall ever seeing the check." [J.A. 400.] Felsner also stated that he did not recall signing or endorsing the check at closing. *Id.* Later in his deposition, Felsner stated that Michelle's check was sent directly to the title company and was payable to the title company. [J.A. 407.] Felsner's testimony is confirmed by a January 20, 2005 letter from Jerry Giorella, a broker manager at Prudential Florida Real Estate Center. [J.A. 433.] In his letter, Giorella states that "Lisa Watson had Michelle Middleton wire the money for the down payment directly to the title company from Michelle's account." *Id.*

The parties intended their actions to be one single transaction by which Felsner would obtain the credit that Middleton could not, and Middleton would pay for the house that Felsner could not. We therefore conclude that Middleton's $90,000 transfer to Felsner was not a gift. Rather, the parties intended that the money, along with Middleton's willingness to let Felsner live in the house with her, serve as consideration for Felsner's later execution of the quitclaim deed to Middleton.[5] We find that

---

[4] Even if we were to improbably consider Middleton's transfer of the $90,000 to Felsner a gift, we agree with the Defendants-Appellants that the gift was conditional. By the express terms of the gift letter, Felsner was expected to use the $90,000 towards the down payment on the house. If he failed to do so, he would presumably be required to give the $90,000 back to Middleton.

[5] The Trustee repeatedly cites Felsner's testimony that the transaction "was basically this wonderful idea to coerce the mortgage company" to give Middleton the house that she wanted. [J.A. 386.] Although not essential to our holding today, we note our confusion as to how the transfer between Felsner and Middleton "coerced" or harmed the lender in any way since Felsner was still obligated on the note, which was secured by the mortgage, when he transferred title to Middleton.

Felsner received a reasonably equivalent value for his transfer of the Florida property to Middleton.

*ii. The Transfer Did Not Render Felsner Insolvent*

Further, even if we were to conclude that Felsner did not receive a reasonably equivalent value for his transfer of the Florida property to Middleton, the transaction still fails to qualify as a fraudulent transfer because the transfer did not render Felsner insolvent.

A transfer can only be considered fraudulent if the debtor "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." FLA. STAT. § 726.105. Florida courts often use a "balance sheet" test by which a debtor is considered insolvent if the "sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." *Paragon Health Serv., Inc. v. Cent. Palm Beach Cmty. Mental Health Ctr., Inc.,* 859 So.2d 1233, 1236-37 (Fla. Dist. Ct. App. 2003) (citing FLA. STAT. § 726.103(1)).

Importantly in this case, the bankruptcy court never determined that Felsner was insolvent as a result of his transfer of the property to Middleton. [J.A. 190-94.] Without this finding by the trier of fact, we cannot conclude at the appellate level that the transfer rendered Felsner insolvent. See *Corzin v. Fordu (In re Fordu),* 201 F.3d 693, 710 (6th Cir. 1999).

Further, the record does not support the conclusion that Felsner reasonably should have believed that he would incur debts beyond his ability to pay as a result of his transfer of the Florida property to his former fiancée. The Trustee claims that before Felsner transferred the property to Middleton, he had title to the property and $90,000 in equity, as well as the $88,000 mortgage. The Trustee says that when Felsner transferred title in the property to Middleton, he lost the $90,000 in equity but retained the $88,000 mortgage, thus resulting in his liabilities exceeding his assets by

$118,000. Putting aside the issue that the bankruptcy court never made this factual determination, we find no evidence that the transfer rendered Felsner insolvent.

On July 19, 2001, Felsner gained $90,000 in equity as a result of making the down payment on the Florida property and then lost the $90,000 by transferring title in the house to Middleton. He incurred a liability in the amount of $88,000 by taking out a mortgage on the property, but he also gained income by renting out the property, a fact overlooked by both the Trustee and the district court. The monthly rental income was deposited directly into Felsner's own account. [J.A. 375-77, 390-91.] Felsner testified that the amount of rental income he received covered his monthly mortgage payments throughout the period that he was responsible for the mortgage, except for two times in which Middleton used her own money to supplement the mortgage payments. [J.A. 375-77.] When Middleton recorded the property deed and Felsner stopped making mortgage payments in late 2002, Fellmy stepped in and assumed the mortgage for Felsner. Thus, the transfer did not render Felsner insolvent because he truly "neither gained nor lost money as a result of the transaction . . ." [Appellant Br. 20.]

We conclude that the Trustee has failed to prove by a preponderance of the evidence that she is entitled to avoid the transfer of property from Felsner to Middleton under 11 U.S.C. § 544(b)(1). Because we find that the Trustee has failed to carry her burden of proof in this case, the Trustee's argument that the Defendants-Appellants are not entitled to equitable relief due to "unclean hands" is inapplicable. We find that the transaction was not a fraudulent transfer under Florida law because Felsner received a reasonably equivalent value in exchange for his transfer and the transaction did not, and was not likely to, render him insolvent.

## IV. Conclusion

For the reasons stated above, we **REVERSE** the order of the district court granting summary

judgment to the Appellee and **REINSTATE** the decision of the bankruptcy court.

**McKEAGUE, Circuit Judge, dissenting.** By permitting unscrupulous home-buyers to lie and deceive in order to receive mortgages they could not obtain honestly, the majority places the imprimatur of this court on conduct that is clearly fraudulent and possibly criminal. Therefore, I respectfully dissent.

By holding that the $90,000 given to Felsner by Middleton was not actually a gift—despite the unambiguous language of the gift letter to the contrary—the majority opinion undercuts the expectations of lenders who rely on these letters everyday when making lending decisions. If the $90,000 was not a gift, as the letter signed by both Felsner and Middleton clearly says it was, then Felsner and Middleton knowingly submitted a false document to a lending institution for the purpose of gaining a loan in violation of both federal and state law. *See* 18 U.S.C. § 1344; *see also* Fla. Stat. § 817.03. In fact, as the district court noted, numerous individuals are serving time in federal prisons for engaging in conduct that is substantially similar to the conduct that the majority has blessed in this case. *See United States v. Paul*, 57 F. App'x 597, 605-06 (6th Cir. 2003) (per curiam) (affirming the bank fraud conviction of an individual who submitted a fraudulent gift letter to a mortgage broker for the purpose of securing a loan).

Under the majority's reasoning, individuals interested in purchasing a home need not be concerned with the veracity of the representations or documentation that they submit to mortgage lenders. It is of no consequence that a real estate agent and a title company employee may have known of Middleton and Felsner's scheme because neither of them represented the lender; there is no evidence that the lender itself was aware that the gift letter was a sham. As Felsner himself testified, he and Middleton did not advise the mortgage lender of their scheme because "it

-16-

specifically states in the contract to the mortgage that [the property] can not be transferred to a second party or third party at all." JA at 384. This statement demonstrates that Felsner and Middleton knew they were engaging in deceitful conduct and knew they would have been unable to obtain the property if the lender was aware of their scheme.

## A. Reasonably Equivalent Value Requirement

Unlike the majority, I am unable to see how the $90,000 gift from Middleton to Felsner—which allowed Felsner to obtain the mortgage and gain title to the property in the first place—constitutes the same transaction as the later transfer of the title to Middleton via quitclaim deed. Simple logic dictates that there were two separate and distinct transactions in this case. First, Felsner received the $90,000 from Middleton and gained title to the property. Second, Felsner quitclaimed the property to Middleton and received nothing of value in return. By holding otherwise, the majority is essentially saying that in the *same* transaction Felsner both gained title to the property and transferred that same title to Middleton. I do not see how that is possible.

Viewing the events in this case as two transactions, leads me to the conclusion that the transfer of the property from Felsner to Middleton via the quitclaim deed was not supported by reasonably equivalent value as is required by Florida's fraudulent transfer statute, Fla. Stat. § 726.105. At the moment Middleton received the quitclaim deed, she provided nothing of value to Felsner, or as Felsner himself put it, he received "zero" in return for deeding the property to Middleton. JA at 368. The $90,000 that Middleton previously gave to Felsner cannot serve as reasonably equivalent value for the quitclaim deed because that money was no longer in their possession; rather, it was in an account belonging to the title company. Looking to Florida's

definition of reasonably equivalent value, title to the property "went out" to Middleton via the quitclaim deed and nothing "was received" by Felsner. *See generally Bakst v. O'Connor & Taylor Dev. Corp. (In re Vilsack)*, 356 B.R. 546, 553 (Bankr. S.D. Fla. 2006). Therefore, I agree with the district court's conclusion that the bankruptcy court erred in holding that the transfer was supported by reasonably equivalent value.

**B. Insolvency Requirement**

With regard to the insolvency requirement found in Fla. Stat. § 726.105, the majority holds that the transfer from Felsner to Middleton did not render Felsner insolvent because several months after the transfer a tenant temporarily assisted Felsner with the mortgage payments. I disagree. The focal point of the insolvency requirement is on the financial result of the transfer at the time it occurred or immediately thereafter. I can find no support for the majority's conclusion that what occurred several months after the property was deeded to Middleton has any bearing on the determination of whether Felsner was rendered insolvent at the moment of transfer or immediately thereafter. Under the majority's reasoning, if a transfer of property resulted in an individual's debts exceeding his assets, the transfer would not have rendered the individual insolvent for purposes of fraudulent transfer law if the individual hit the lottery several months after the transfer. That is not the law. It is also important to note that the majority's statement that Felsner was not rendered insolvent because he "neither gained nor lost money as a result of the transaction," lacks merit. As a result of the transfer to Middleton, Felsner retained mortgage indebtedness and lost title to a substantial asset (i.e., the property). Thus, it is incorrect to say that the transfer did not negatively impact Felsner's financial condition.

For the reasons stated above, I respectfully dissent.