Brenda L. NEBESHO f/k/a
Brenda L. Brown,

v.

Albert D. BROWN and
Ellen Ann Milos.

Appeal of: Albert D. Brown.

Brenda L. Nebesho f/k/a
Brenda L. Brown,

v.

Albert D. Brown and Ellen Ann Milos.

Appeal of: Ellen Ann Milos.

Superior Court of Pennsylvania.

Argued Jan. 13, 2004.
Filed March 26, 2004.

---

Alan R. Mege, Hellertown, for Brown, appellant.

Megan M. McDonald, Hellertown, for Milos, appellant.

Daniel K. McCarthy, Allentown, for appellee.

Before: BENDER, BECK and KELLY, JJ.

BENDER, J.

¶ 1 Albert D. Brown (Brown) and Ellen Ann Milos (Milos) individually appeal from the June 5, 2003 Decree that denied their exceptions to the Decree Nisi issued on February 10, 2003. Although Brown and Milos each raise different issues in their appeals to this Court, the underlying equity action filed by Brenda L. Nebesho f/k/a Brenda L. Brown (Nebesho) against Brown and Milos arose from the same set of facts and was tried before a Chancellor sitting in equity. For that reason, we consolidate the appeals, although we will address each appellant's issues separately.

¶ 2 Nebesho filed this equity action seeking to nullify a deed that she alleged contained her forged signature and purported to convey the marital home in which she and Brown lived during their marriage. The deed purported to convey the property to Milos, who is Brown's new wife. As found by the Chancellor, Brown either forged Nebesho's signature or had someone else forge her signature, without Nebesho's or Milos's knowledge, to effectuate transfer of the property to Milos. In her complaint, Nebesho requested "rescission of the deed and reconveyance of her undivided one-half interest in the property." Chancellor's Opinion (C.O.), 2/10/03, at 1–2. Nebesho also requested an award of counsel fees, costs, and punitive damages.

¶ 3 In the opinion supporting the Decree Nisi, the Chancellor set forth the following recitation of the facts:

Nebesho and Brown were husband and wife until divorcing in March of 1998. During their marriage, they acquired a residence at 3733 Viewpoint Court in Washington Township, Lehigh County. Nebesho vacated their marital home in February or March of 1997, but Brown continued to reside there. At the time of their separation, the property was encumbered by a first mortgage in favor of Federal Mortgage National Bank and a second mortgage held by Household Finance Corporation. Both mortgages were in default. The first mortgagee commenced foreclosure proceedings and the property was eventually scheduled for a Sheriff's sale. During this period, Brown phoned Nebesho and offered her $1,000.00 for her interest in

the home She rejected this offer, countering that she would be willing to convey her interest for $15,000.00, which counter-offer Brown declined. Thereafter, Nebesho heard nothing further regarding the property until March 2001. Curious that she was no longer receiving notices concerning the foreclosure proceeding, she asked her [new] husband to check the records in the Lehigh County Recorder of Deeds Office. Mr. Nebesho's inquiries uncovered the July 17, 2000 deed which conveyed the property to Milos for a consideration of $130,000.00.

In the early part of 1998, Nebesho filed a Chapter Seven bankruptcy proceeding. In her Debtor's Statement of Intention filed with the Bankruptcy Court, she declared that that [sic] the Viewpoint Court property was "to be surrendered" to the mortgage holders. Prior to 2000, the Bankruptcy Court granted Nebesho a discharge which relieved her from any further personal liability on the mortgage notes and any potential liability for a deficiency judgment.

Settlement on the transfer of the Viewpoint Court property to Milos was held on July 31, 2000, at the Hellertown office of William H. Duh, Esquire. Milos financed the purchase with a $104,000.00 mortgage loan from Greenpoint Mortgage Funding, Inc. and approximately $35,000.00 of her own funds. Out of the proceeds of that settlement, the first mortgage to Federal Mortgage National Bank was paid in full in the amount of $122,720.00. The second mortgage was compromised outside of settlement by Milos paying Household Finance the sum of $10,000.00. The settlement statement indicates net proceeds to the sellers of $3,600.00, but that amount was paid to a mortgage broker for his services in arranging the financing for the transaction and negotiating with the mortgage holders. (Exhibit "Brown 2") Accordingly, neither Brown nor Nebesho realized any money from the settlement. Brown did, however, receive the benefit of being able to continue living in the former marital home which he testified he wanted to do all along. Brown now lives in the home with Milos, whom he has now married.

The deed conveying title to Milos was notarized by Shirley B. Gilbert, a self-employed Allentown notary public. In answers to written interrogatories, Gilbert stated that she had no independent recollection of the transaction, could find no records pertaining to same, and could not remember either Brown or Nebesho being in her office. However, she indicated that she would not have notarized a document unless both subscribers appeared before her and presented photo identification.... Brown testified that both he and Nebesho arrived at Gilbert's office in separate vehicles, entered together, presented their photo I.D.'s and signed the deed in Gilbert's presence.

Nebesho categorically denied either signing the deed or being in Gilbert's office on the day the deed was executed.

The deed was dated July 17, 2000, and recorded on July 31, 2000, in Lehigh County Deed Book Volume 1664, at Page 493.

In addition to the pay-off of the second mortgage for the sum of $10,000.00, Milos paid $35,295.69 in down monies and closing costs. Since acquiring title to the property, she has spent $35,299.66 for renovations, repairs and other improvements and $47,524.54 on account of debt service, real estate taxes and insurance.

Milos and Brown were married on December 2, 2001. They both continue to reside in the home.

The purported signature of Nebesho on the July 17, 2000 deed is not Nebesho's signature but, rather, is a forgery. The identity of the forger was not established during the hearings, but a reasonable inference from the evidence is that Brown either signed his former wife's name to the deed or arranged for someone else to sign it.

C.O. at 2–5. Additionally, the Chancellor noted that no evidence was produced that tended to prove that Milos was a party to the forgery and, thus, she was deemed a bona fide purchaser for value.

¶ 4 In reaching a decision with regard to what relief should be granted, the Chancellor recognized that to reconvey a one-half interest in the property to Nebesho, who admitted that at the time of the fraudulent conveyance she had no equity in the property, would be inequitable in that Milos, who did not participate in or have any knowledge of Brown's forgery, was a bona fide purchaser for value. Accordingly, the Chancellor issued a Decree Nisi, ordering the reconveyance of an undivided one-half interest in the property to Nebesho, but also requiring Nebesho to reimburse Milos for one-half of the payoffs made on the two mortgages, with the reimbursement to be secured by a lien on the property. The Chancellor also imposed all costs and transfer taxes due in connection with the reconveyance of the property on Brown. Additionally, Nebesho's claim for counsel fees, costs, and expenses against Brown was granted.

¶ 5 After exceptions to the Decree Nisi were denied by the Chancellor, both Milos and Brown filed appeals to this Court, which we have consolidated. Brown raises the following two issues for our review:

I. Did the trial court err in its determination that plaintiff Nebesho had sustained her burden of proof by clear and convincing evidence?

II. Did the trial court commit an error of law by granting plaintiff Nebesho an award of attorney[']s fees?

Brown's brief at 4.

¶ 6 Milos raises the following three issues for our review:

I. Did the trial court err by requiring [Nebesho's] acquiescence to [Milos'] expenditures as a prerequisite to compensating [Milos] for those expenditures?

II. Did the trial court err by requiring an increase in value to the property before compensating [Milos] for necessary expenses for debt service, upkeep, and repair of the subject property?

III. Did the trial court err in its computation of the compensation due to a bona fide purchaser for value who is ordered to convey real property to a third party?

Milos' brief at 5.

¶ 7 When reviewing an equitable decree, "our standard of review is limited. We will reverse only where the trial court was palpably erroneous, misapplied the law or committed a manifest abuse of discretion. Where there are any apparently reasonable grounds for the trial court's decision, we must affirm it." *Viener v. Jacobs,* 834 A.2d 546, 554 (Pa.Super.2003) (citations omitted). Moreover,

The function of this Court on an appeal from an adjudication in equity is not to substitute [our] view for that of the lower tribunal; our task is rather to determine whether "a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of that tribunal."

*Hess v. Gebhard & Co., Inc.,* 570 Pa. 148, 808 A.2d 912, 920 (2002) (quoting *Aiken Indus., Inc. v. Estate of Wilson,* 477 Pa. 34, 383 A.2d 808, 810 (1978)). Additional-

ly, we note that "[w]hen reviewing the results of a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence." *Viener*, 834 A.2d at 554.

## Brown's Appeal

■ ¶ 8 Brown first argues that "[e]quity will not grant relief where ... there is a plain and adequate remedy at law." Brown's brief at 9. Specifically, he relies on his claims that Nebesho could have sought a money judgment against him for half of the amount of the equity he possessed in the property at the time of transfer or the amount he received at the time of the sale. We disagree.

¶ 9 In *Rupel v. Bluestein*, 280 Pa.Super. 65, 421 A.2d 406 (1980), this Court explained the circumstances upon which a suit is maintainable under the principles governing traditional actions in equity. The *Rupel* court stated:

It has been held that equitable jurisdiction attaches "when an individual equity-plaintiff has shown that the wrongdoer's acts, in addition to violating the criminal law, are also interfering with that individual plaintiff's property rights .... or with that individual plaintiff's personal or civil rights." *Pa. S.P.C.A. v. Bravo Enterprises*, 428 Pa. 350, 359, 237 A.2d 342, 347 (1968). More generally, it has been stated that "[c]ourts of equity ... have the power to prevent or restrain the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals." *Bruhin v. Commonwealth*, 14 Pa.Cmwlth. 300, 304, 320 A.2d 907, 910 (1974). Courts in equity are also competent to exercise jurisdiction over cases of fraud....

*Id.* at 410 (string citations omitted). *See also The Maccabees v. Cappas*, 164 Pa.Super. 317, 64 A.2d 513, 514 (1949) (providing that "fraud vitiates everything that it

touches, and an allegation of fraud coupled with a prayer for an appropriate and characteristic equitable remedy always calls for the powers of the chancery court"). Accordingly, in light of Brown's forgery of Nebesho's signature, we conclude that Brown's first argument fails.

■ ¶ 10 Brown also asserts that, because Nebesho acknowledged that she had abandoned any interest in the property by allowing it to be sold at a sheriff's sale and by filing her Statement of Intention with the bankruptcy court, she demonstrated an inconsistency between her prior actions and her present request in equity amounting to unclean hands. Again, we disagree with Brown's position, as did the trial court, which stated:

While [Brown's] argument appears on its surface to have some merit, a closer examination persuades us that Nebesho's bankruptcy filing should not bar her from equitable relief in the instant proceeding. It is clear that the primary purpose of a Statement of Intention under § 521(2)(A) of the Bankruptcy Act is to provide notice to creditors of the debtor's intention with respect to the retention of property securing consumer debts; it is a notice provision rather than a rule of substantive law. See *In Re Bracamortes*, 166 B.R. 160 (U.S.D.C., S.D.Cal., 1994). We have not found, and counsel have not brought to our attention, any federal or state decision which holds that such an election has any substantive legal effect on a debtor's property rights, whether by estoppel or otherwise, and we are unwilling to make such a quantum leap. Accordingly, we hold that the clean hands doctrine does not bar Nebesho's claims to restore her one-half interest in the Viewpoint Court property.

C.O. at 11.

¶ 11 Brown's claim that Nebesho "demanded" payment of $15,000 to allow him

to sell the property or forestall the foreclosure and his assertion that Nebesho agreed to convey her interest for an unidentified sum between $1,000 and $15,000 were found by the trial court to be incredible. Specifically, the court stated:

> Brown's explanation that Nebesho agreed to convey her interest in exchange for Brown's vague promise that he would pay her "a sum more than $1,000 but less than $15,000 when the funds became available to him" ... is improbable and borders on pure fantasy. The previous acrimonious negotiations between the parties evidenced Nebesho's manifest distrust of Brown. That she would have accepted Brown's promise of payment of an indeterminate amount at some uncertain time in the future when he might have the money strains the credulity of the Court.

C.O. at 8. Recognizing that these findings are dependent on credibility determinations, we will not overturn them as "the chancellor had the opportunity to observe the demeanor of the witnesses." *See Cambria–Stoltz Enters. v. TNT Invs.,* 747 A.2d 947, 950 (Pa.Super.2000). "We will not disturb the trial court's findings simply because [Brown] would have preferred another outcome." *Id.*

■ ¶ 12 Brown next argues that the court erroneously concluded that Nebesho established by clear and convincing evidence that the transfer of the property was a fraudulent transfer. He relies on his own self-serving statement that Nebesho appeared at the notary's office and executed the deed, as well as, the statement by the notary public "that she would not have notarized a document unless both subscribers appeared before her and presented photo identification." Brown's brief at 11. He further relies on the testimony of his handwriting expert, Curtis Baggett, who opined that Nebesho's signature on the deed was in fact Nebesho's. He disregards the fact that the Chancellor found that Nebesho's handwriting expert, John S. Gencavage, was "more credible and persuasive" and that his testimony was corroborated by testimony other than "the self-serving testimony of Brown, which ... we did not find credible." C.O. at 7.

■ ¶ 13 Although Brown acknowledges that witnesses' credibility and the weight to be given their testimony is for the fact finder to decide, he focuses on the Chancellor's failure to announce that Nebesho met her burden of proof by clear and convincing evidence. However, he cites no authority requiring the Chancellor to enunciate such a statement and we conclude that a failure to make this statement is not error.

■ ¶ 14 Again, Brown's argument is essentially an attack on the Chancellor's credibility determinations, which we refuse to overturn. *See Yarnall v. Almy,* 703 A.2d 535, 536 (Pa.Super.1997) (stating that we are bound to accept chancellor's findings "particularly where such findings are largely dependent upon the credibility of witnesses" and "because the demeanor and credibility of witnesses, as well as conflicts in the evidence presented, are issues solely determined by the trier of fact and, therefore, beyond the scope of review of appellate courts"). Moreover, we recognize that to rebut the presumption of the due execution of a deed, one must prove forgery by clear and convincing evidence. *Warehouse Builders and Supply Inc. v. Perryman,* 215 Pa.Super. 413, 257 A.2d 349, 350 (1969). Our review of the record reveals that Nebesho presented more than sufficient, competent evidence, which the Chancellor found credible and, therefore, meets the clear and convincing standard of proof.

¶ 15 In his final argument, Brown contends that the Chancellor erred in granting Nebesho's request for attorney's fees. He relies on *Pittsburgh Live, Inc. v. Servov*, 419 Pa.Super. 423, 615 A.2d 438, 441–42 (1992), for the proposition that "[e]ach litigant is responsible for his own attorney[']s fees absent an agreement of the parties or some other established exception, and fraud is not such an exception." Brown's brief at 12. Brown acknowledges that "[p]unitive damages in the nature of attorney's fees may be granted if there [are] aggravating circumstances above and beyond those that justified the award of compensatory damages." *Id.* (relying on *Servov*). However, Brown asserts that "when fraud is the basis of compensatory damages, the same fraudulent conduct is not sufficient to base an award of punitive damages without more...there must be acts of malice, vindictiveness and a wholly wanton disregard of the rights of others." *Id.* (quoting *Servov*, 615 A.2d at 442).

¶ 16 Thus, based on the above-stated law, Brown asserts that the Chancellor did not proceed beyond a finding of fraud, and that the evidence would not support a finding of aggravated circumstances. Rather, Brown indicates that the motive was merely to effectuate the transfer of real property, to avoid the necessity of moving and disrupting his business, and to avoid a deficiency judgment. Of course, Nebesho disagrees with Brown's characterization, indicating that his intentional criminal acts make an award of punitive damages necessary. She recognizes that pursuant to case law, counsel fees are improper under the circumstances, but suggests that the amount of 'counsel fees' as they were labeled by the Chancellor and imposed by him could substitute as a proper punitive damage award. Notably, the Chancellor's following statement appears to imply that Brown's motive was malicious, vindictive and constituted a wholly wanton disregard of the rights of others:

> [O]ne need not summon the deductive powers of a Sherlock Holmes to the problem in order to conclude that Brown either signed his former wife's name to the deed or arranged for someone else to sign it. He had ample motive for the act. He would thereby accomplish the dual objectives of having his mortgage notes paid off and forestall the possibility of a deficiency judgment. At the same time, he would assure his own continued possession of the property by arranging for its purchase by his fiancée. The only thing standing in his way was Nebesho's refusal to sign off on the property. Brown overcame that obstacle by the simple expedient of forging, or arranging for someone else to forge, his ex-wife's name to the deed. No doubt he expected that Nebesho would merely assume that the home had been lost at Sheriff's sale and that she would not bother to make any further inquiries.

C.O. at 8–9. Accordingly, we are constrained to conclude that the Chancellor's award of attorney's fees, which both parties agree are improper unless such fees are in the nature of punitive damages, may not stand. However, despite its denial of punitive damages,[1] the trial court's opinion provides a sufficient basis for such an award as the facts found by the Chancellor meet the aggravated circumstances test as outlined in *Servov*. *See also Viener*, 834 A.2d at 561 (stating that the factual record demonstrated that punitive damages were properly assessed). Nevertheless, because of the inconsistency between the language

---

1. The trial court ordered that "6. All other claims for relief ... including claims for punitive damages, are hereby DENIED and DISMISSED." Decree Nisi, 2/10/03, ¶ 6.

in the trial court's opinion and its decree nisi, we must remand to allow the court to expressly determine the nature of its award, *i.e.,* to clarify whether its attorney's fee award is or is not in the nature of punitive damages.

¶ 17 For the reasons stated above and with the exception of the attorney's fees issue, we conclude that the issues Brown raises in his appeal at 2098 EDA 2003 are without merit.

### Milos's Appeal

¶ 18 We now turn to the issues raised by Milos. She first argues that, because the Chancellor determined that she was a bona fide purchaser for value, she was entitled to "reimbursement for her expenditures made for repairs, debt service, maintenance, and improvements to the property." Milos's brief at 11. Milos contends that the Chancellor's reason for denying reimbursement, *i.e.,* that Milos failed to inform Nebesho about the expenses or receive Nebesho's acquiescence, was an error of law. We agree, but note that the Chancellor also indicated that his refusal to order reimbursement to Milos was because the evidence presented did not show that the improvements resulted in an increase in the market value of the property. Moreover, the Chancellor concluded that if the expenditures enhanced the value of the property, Milos would receive the increase in value when the property was sold.

¶ 19 Milos relies on *Godzieba v. Godzieba,* 393 Pa. 544, 143 A.2d 344 (1958), and on *Stanko v. Males,* 390 Pa. 281, 135 A.2d 392 (1957), to support her argument that she is due reimbursement for the expendi-

tures to maintain and to improve the property. Although both cases provide for reimbursement, the *Stanko* opinion explains that where a bona fide purchaser of property makes improvements and the real owner seeks equitable relief, the court "will compel him to pay for the improvements to the extent that they have *enhanced the value* of the land." *Id.* at 395 (emphasis added). This includes payment for expenditures for insurance and for improvements necessary to maintain the property "to the extent that the property was benefited thereby." *Id.* Moreover, the *Stanko* court indicated that an offset for "the value of the use made of the property and the rents received therefrom" should be reimbursed to the real owner. *Id.*

¶ 20 Based upon the above, we conclude that the Chancellor did not err in refusing to require Nebesho to reimburse Milos for some of the expenditures Milos claimed were due. Without evidence believed by the Chancellor that the property's value was enhanced,[2] reimbursement was not required for those items other than taxes and mortgage expenditures, *i.e.,* interest paid by Milos on the mortgage.[3] Moreover, any such reimbursement would need to be offset by rent payments due Nebesho for the time Milos and Brown lived in the home.

¶ 21 Milos's final issue encompasses three arguments: 1) that Milos is due interest on the sums owed to her, specifically, for the interest paid on each mortgage loan payment, 2) that Milos is due one-half of the expenses made for necessary upkeep and repairs, and for property

---

**2.** Milos submitted an appraisal of the property that was performed to secure a mortgage. The Chancellor appears to have given the document little weight when he found that repairs and improvements did not result in an increase in value.

**3.** We are also aware that there are tax implications involved, which should be taken into consideration by the Chancellor on remand.

taxes and insurance payments, and 3) that Milos is due one-half of the increase in value to the property attributable to her expenditures and improvements. These arguments again rely on the *Godzieba* and *Stanko* opinions and to a great extent reiterate Milos's previous arguments. However, as stated above, these decisions appear not to require reimbursement for items other than taxes and the mortgage interest expenditures without proof that the property was enhanced. Specifically, the *Stanko* opinion provides:

> Under the circumstances of this case justice requires that the decree be modified so as to include therein directions that the plaintiff pay the defendants an amount equal to the tax and mortgage expenditures made by them, plus the expenditures made for the improvement and necessary maintenance and insurance of plaintiff's property to the extent that the property was benefited thereby, less the value of the use made of the property and the rents received therefrom by the defendants.

*Id.* at 395.

¶ 22 Because we recognize that the *Stanko* opinion does not require an increase in the value of the property before tax and mortgage interest payment reimbursement are imposed, and because we interpret *Stanko* to require the real owner to compensate the bona fide purchaser for payments made to discharge claims against the property, we are compelled to remand this matter. The Chancellor is to consider the amounts paid by Milos for taxes and mortgage interest payments and attribute one-half of those costs to Nebesho. Moreover, the Chancellor should accept evidence with regard to the fair market rental value of the property and offset one-half of that amount against the sums due Milos for reimbursement of taxes and interest.

¶ 23 Other than the reimbursement issue regarding taxes and mortgage interest payments offset by rental value, which requires that we remand the matter, we conclude that the Chancellor did not misapply the law, nor did he commit a manifest abuse of discretion. Rather, we conclude that there are reasonable grounds for the decision here that attempts to place both Nebesho and Milos in the positions they were in at the time that Brown perpetrated the fraudulent conveyance. Under difficult circumstances, the Chancellor fashioned relief in an as equitable a manner as could be devised.

¶ 24 Accordingly, we remand the matter for modification of the Decree as provided for in this Opinion and as set forth in *Stanko*. The Chancellor shall hold an evidentiary hearing, if necessary. In all other respects, the Decree as to Milos's appeal at 2099 EDA 2003 is upheld.

¶ 25 Decree affirmed in part and matter remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.