J. A21039/19

2020 PA Super 24

| | | |
|---|---|---|
| JOSEPH McGOLDRICK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| MEGAN MURPHY, | : | No. 632 EDA 2019 |
| | : | |
| Appellant | : | |

Appeal from the Judgment Entered April 2, 2019,
in the Court of Common Pleas of Montgomery
County Civil Division at No. 2018-05803

BEFORE:  BOWES, J., OLSON, J., AND FORD ELLIOTT, P.J.E.

OPINION BY FORD ELLIOTT, P.J.E.:          **FILED FEBRUARY 06, 2020**

Megan Murphy ("Megan") appeals from the April 2, 2019 judgment entered in the Court of Common Pleas of Montgomery County on the trial court's order entered January 17, 2019, that divided the settlement proceeds of the home formerly owned by Megan and appellee Joseph McGoldrick ("Joseph").  We affirm.

The record reflects that Megan and Joseph began dating in July 2010. A romantic relationship quickly ensued, and in the fall of the same year, Megan moved in with Joseph.  The two lived together in Joseph's residence for six and one-half years.  In approximately December of 2015, Megan and Joseph decided to marry.  At this time, they also decided to look for a home to purchase together.  Due to budget constraints, the couple's plans to buy a home put Joseph's purchase of an engagement ring for Megan on hold.

In late 2016, Megan and Joseph decided to purchase a home on Chestnut Street in Royersford, Pennsylvania (the "Home"), for $205,000. Because Joseph had the financial means necessary to close on the Home and Megan was more creditworthy than Joseph, the two agreed that Joseph would withdraw the needed money from his retirement fund and Megan would solely execute the mortgage note.[1]

The record reflects that on November 9, 2016, Joseph withdrew $5,000 from an Ameriprise Financial account that he owned, which sum represented payment of the hand money that he and Megan needed to bind the sale contract. As part of the mortgage loan application, the bank required Megan and Joseph to execute a gift letter to document the source of the $5,000 and to verify that Megan's receipt of the $5,000 constituted a gift to be applied toward the purchase of the Home and not a loan. The $5,000 gift letter[2] reflects that Joseph certified to the bank that he withdrew $5,000 from his Ameriprise Financial account, gifted that $5,000 to Megan whose relationship to him is set forth on the gift letter as "fiancé," and that the $5,000 "gift is to be applied toward the purchase of the [Home]." (Megan's answer, new matter, and counterclaim, 4/16/18 at Exhibit "C.") The $5,000 gift letter further states that "[n]o repayment of the gift is expected or implied in the form of cash or by future services of the recipient." (*Id.*)

---

[1] The record reflects that both Megan and Joseph executed the mortgage.

[2] We note that the $5,000 gift letter is executed by both parties, but not dated.

The record further reflects that on November 23, 2016, Joseph withdrew $47,000 from his Ameriprise Financial account, which sum represented a 20 percent down payment on the Home, together with closing costs. As part of the mortgage loan application, the bank required Megan and Joseph to execute a gift letter to document the source of the $47,000 and to verify that Megan's receipt of the $47,000 was a gift and not a loan. The $47,000 gift letter[3] reflects that Joseph certified to the bank that he withdrew $47,000 from his Ameriprise Financial account, gifted that $47,000 to Megan whose relationship to him is set forth in the gift letter as "fiancé," and that the $47,000 "gift is to be applied toward the purchase of the [Home]." (**Id.** at Exhibit "D.") The gift letter further states that "[n]o repayment of the gift is expected or implied in the form of cash or by future services of the recipient." (**Id.**)

On December 29, 2016, Megan and Joseph closed on the Home, taking it as joint tenants with the right of survivorship. At this time, the two began to share all Home-related expenses. After making some renovations, Megan and Joseph moved into the Home in March 2017. In June 2017, Joseph gave Megan an engagement ring.

On March 10, 2018, however, Megan ended the engagement and returned the ring to Joseph. At this point, Joseph continued to live in the

---

[3] We note that the $47,000 gift letter is executed by both parties but not dated.

Home and Megan stayed there occasionally. It was also at this point that Joseph stopped paying his share of the Home-related expenses and Megan assumed payment of all of those expenses. In August 2018, Megan permanently moved out of the Home but continued to pay all Home-related expenses.

On March 23, 2018, Joseph initiated the underlying action by filing a complaint in equity – partition. On September 21, 2018, the trial court entered the following order:

> AND NOW, this 21st day of September, 2018, during a conference call with counsel, the parties expressed their agreement to list the [Home] for sale and further agree that the proceeds of the sale shall be placed in escrow with the title company. Absent an agreement between the parties, the [trial c]ourt shall be notified upon the sale of the [Home] at which time chambers shall promptly schedule this matter for a one hour hearing to address division of assets.

Trial court order, 9/21/18.

In November 2018, the Home sold at a loss, yielding $41,884.86 in settlement proceeds. We note that the record reflects that the parties also received a homeowners' insurance payment credit in the amount of $101. Therefore, the total amount escrowed was $41,985.86, which we will refer to as the "settlement proceeds."

As the parties could not agree on the division of the settlement proceeds, the trial court held the agreed-upon hearing, at which only Megan and Joseph testified. On January 17, 2019, the trial court entered its order

dividing the settlement proceeds, awarding $5,688.43 to Megan, which sum equaled 50 percent of the money she expended on Home-related expenses from April through October 2018, and awarding $36,297.42[4] to Joseph, which sum represented the remaining balance in escrow. (Trial court order, 1/17/19.)

On January 28, 2019, Megan filed a post-trial motion. The trial court denied the motion on February 14, 2019. On February 25, 2019, which was prior to entry of judgment, Megan filed a notice of appeal. On March 5, 2019, the trial court ordered Megan to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Megan filed her Rule 1925(b) statement on March 12, 2019. Because judgment had not been entered, this court entered an order on March 28, 2019, directing Megan to praecipe the trial court prothonotary to enter judgment on the trial court's January 17, 2019 order.[5] The order further directed that within ten days of entry of judgment, Megan was to file with the prothonotary of this court a certified

---

[4] We note that there is a one-cent discrepancy in the amount escrowed and the amounts awarded in the trial court's January 17, 2019 order.

[5] Pennsylvania Rule of Appellate Procedure 301 requires that an appeal be taken from a final order. Pa.R.A.P. 301(a), (c) & (d); **see also Fanning v. Davne**, 795 A.2d 388, 391-392 (Pa.Super. 2002), **appeal denied**, 825 A.2d 1261 (Pa. 2003) (reiterating that appeal properly lies from judgment entered following trial court's disposition of post-trial motions, not from order denying post-trial motions).

copy of the trial court docket reflecting entry of judgment. Megan timely complied.[6] This appeal is now ripe for our review.[7]

Megan raises the following issues:

> I. With all parties and the [t]rial [c]ourt in [a]greement, have the requirements of a Part 1 Partition Order been met?
>
> II. Does a signed writing, "Gift Letter", which expressly identifies the donee as "Fiancé" and states that "[n]o repayment of the gift is expected or implied in the form of cash or by future services of the recipient" trump prior court holdings of gifts in contemplation of marriage which did not involve express, written waivers[?]

Megan's brief at 7.

> When reviewing an equitable decree, our standard of review is limited. We will reverse only where the trial court was palpably erroneous, misapplied the law or committed a manifest abuse of discretion. Where there are any apparently reasonable grounds for the trial court's decision, we must affirm it. Moreover,
>
>> [t]he function of this Court on an appeal from an adjudication in equity is not to substitute [our] view for that of the lower tribunal; our task is rather to determine whether a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of that tribunal.

---

[6] We note that the trial court filed its Rule 1925(a) opinion on April 8, 2019.

[7] Pursuant to Pa.R.A.P. 905(a)(5), this court treats a notice of appeal filed after the announcement of a determination but before entry of an appealable order as filed after entry of the appealable order and on the day thereof.

> Additionally, we note that when reviewing the results of a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence.

**Nebesho v. Brown**, 846 A.2d 721, 725-726 (Pa.Super. 2004) (internal citations, quotation marks, and original brackets omitted).

In her first issue, Megan contends that the trial court's September 21, 2018 order that memorialized the parties' agreement regarding the sale of the Home and the distribution of the settlement proceeds followed by the actual sale of the Home abrogated the need to record a Part 1 partition order, but nevertheless served the purpose of a Part 1 partition order. (Megan's brief at 13-16.) In Megan's words, "the joint tenancy was terminated on sale and the proceeds turned into a tenancy in common – the same result as a recorded Part 1 order under **Kapcsos v. Benshoff**[, 194 A.3d 139 (Pa.Super. 2018) (**en banc**)]." (**Id.** at 15.). According to Megan, "[w]hat actually happened here was that the net proceeds of the [Home] sale were the pie to be divided in a Part [2] **Kapcsos** proceeding. Part 1 being a transaction from a joint tenancy, and Part [2] being division of proceeds." (**Id.**) Megan contends that the December 20, 2018 hearing constituted the Part 2 hearing where the parties presented "evidence of monetary contributions as set offs toward

owelty."[8]  (*Id.* at 17.)  Megan further contends that to the extent the trial court's September 21, 2018 order was not a "technically correct" Part 1 order, this court should overlook any procedural defect because Pennsylvania Rule of Civil Procedure 126 requires liberal construction of civil procedure rules. (*Id.* at 15-16.)  Megan requests a remand for entry of a final order that awards her one-half of the settlement proceeds plus the $5,688.43 that she was already awarded.[9]  (*Id.* at 21.)

Pennsylvania Rules of Civil Procedure 1551-1574 govern "the procedure in an action for the partition of real estate."  Pa.R.Civ.P. 1551 (setting forth form of partition action).

> [Rules] 1551-1574 split a partition action into two, distinct, chronological parts.  Rules 1551-1557 govern Part 1, and Rules 1558-1574 govern Part 2.  Each

---

[8] "Owelty" has been defined as:  "1. Equality as achieved by a compensatory sum of money given after an exchange of parcels of land having different values or after an unequal partition of real property.  2. The sum of money so paid." ***Bernstein v. Sherman***, 902 A.2d 1276, 1279 n.3 (Pa.Super. 2006), citing ***Black's Law Dictionary*** 1230 (7th ed. 1999).  ***See also*** Pa.R.Civ.P. 1562 (setting forth Part II partition action procedural rule regarding real estate not capable of a proportionate division).

[9] We note that the trial court opined that Megan waived this issue because she participated in the proceedings below and never objected or claimed that the law entitled her to an equal distribution of the settlement proceeds.  (Trial court opinion, 4/8/19 at 7.)  ***See*** Pa.R.A.P. 302(a) (stating that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").  A reading of the hearing transcript, however, reveals that Megan's counsel argued that by "operation of law set forth in our memo, the property is divided equally" in accordance with the civil procedure rules governing partition actions.  (Notes of testimony, 12/20/18 at 108.)  A reading of Megan's trial memorandum and post-trial motion reveals that she arguably raised the issue with the trial court.  Therefore, we decline to find waiver.

> part, by rule, must produce its own, distinct, appealable order.
>
> The first order, under Pa.R.Civ.P. 1557, directs partition of the parties' legal interests into severalty. **See Johnson v. Gaul**, 228 Pa. 75, 77 A. 399, 400 (Pa. 1910) ("partition is a possessory action; its purpose and effect being to give to each of a number of joint owners . . . his [or her] share in severalty").
>
> The second order, under Pa.R.Civ.P. 1570, does one of three things. A Rule 1570 order may (1) divide the partitioned property among the parties, (2) force one or more of the parties to sell their interest in the land to one or more of the parties, or (3) sell the land to the general public and distribute the proceeds among the parties.

**Kapcsos v. Benshoff**, 194 A.3d at 141-142.

Here, Megan theorizes that when one joint tenant institutes a partition action, but both joint tenants thereafter agree to sell the real estate and, if need be, have a judge determine how the sale proceeds are divided, which agreement is memorialized in a court order, the subsequent sale of the real estate, together with the court order memorializing the co-tenants' agreement, serve the purpose of a Part 1 partition order and an equal division of the sale proceeds, as adjusted by owelty, is required because the former joint tenants now own the sale proceeds as tenants in common. The law provides no support for Megan's theory. The law holds that

> partition is a possessory action; its purpose and effect being to give to each of a number of joint owners the possession to which he is entitled of his share in severalty. It is an adversary action and its proceedings are compulsory. **The purpose of the action of partition is to divide property**, not to sell

> it.  A sale may become an incident, but is not the objective point of it.

***Russo v. Polidoro***, 176 A.3d 326, 329-330 (Pa.Super. 2017) (quotation marks, ellipses, brackets, and internal citations omitted; emphasis added).

Here, before the trial court ever considered the propriety of the entry of a Part 1 order that would have directed partition of the parties' legal interests in the Home into severalty, Megan and Joseph agreed to sell the Home and, if need be, allow the trial court to divide the sale proceeds, which agreement was memorialized in the September 21, 2018 order.  When the Home sold, Megan and Joseph no longer had legal interests in the Home.  Consequently, and despite Megan's insistence to the contrary, at the time of the sale, the procedural rules, as well as the case law, that govern an action for the partition of real estate ceased to apply simply because the sale of the Home extinguished the parties' legal interests and there was no longer any real estate to partition.[10]

Megan next claims that the trial court erred when it concluded that the $52,000 Joseph contributed to purchase the Home was a conditional gift in contemplation of marriage because the plain language of the gift letters executed by the parties constituted an "express waiver of repayment" which "trumps case law on conditional gifting."  (Megan's brief at 20.)  According to Megan, Joseph's waiver of repayment as evidenced by the gift letters entitles

---

[10] We note that owelty has no application here because there was no unequal partition of the Home.  Indeed, there was no partition at all.

her to 50 percent of the settlement proceeds, plus the $5,688.43 that she was already awarded.

In **Nicholson v. Johnston**, 855 A.2d 97, 101-102 (Pa.Super. 2004), this court reiterated the law of conditional gifts as previously discussed in **Lindh v. Surman**, 702 A.2d 560 (Pa.Super. 1997), **affirmed**, 742 A.2d 643 (Pa. 1999), and as set forth in the Restatement (First) of Restitution § 58 (1937), as follows:

> Gifts Made in Reliance on a Relation.
>
> A person who has conferred a benefit upon another, manifesting that he does not expect compensation therefor, is not entitled to restitution merely because his expectation that an existing relation will continue or that a future relation will come into existence is not realized, **unless the conferring of the benefit is conditioned thereon**.
>
> . . . .
>
> (b) Conditional gifts. The gift may be conditional upon the continuance or creation of a relation, and if conditional the donor is entitled to its return if the relation terminates or is not entered into. The condition may be stated in specific words or it may be inferred from the circumstances. Likewise, as in the case of engagement and wedding gifts, justice may require the creation of a condition although the donor had no such condition in mind.
>
> (c) Wedding and engagement gifts. Gifts made in the hope that a marriage or contract of marriage will result are not recoverable, in the absence of fraud. Gifts made in anticipation of marriage are not

ordinarily expressed to be conditional and, although there is an engagement to marry, if the marriage fails to occur without the fault of the donee, normally the gift cannot be recovered. If, however, the donee obtained the gift fraudulently or if the gift was made for a purpose which could be achieved only by the marriage, a donor who is not himself at fault is entitled to restitution if the marriage does not take place, even if the gift was of money. If there is an engagement to marry and the donee, having received the gift without fraud, later wrongfully breaks the promise of marriage, the donor is entitled to restitution if the gift is an engagement ring, a family heirloom or other similar thing intimately connected with the marriage, but not if the gift is one of money intended to be used by the donee before the marriage.

. . . . Additionally, the Reporter's notes recognize:

As to gifts other than services or engagement rings the decided cases have generally allowed recovery upon the same basis as in the case of the rings. It is to be noted, however, that in all the cases in which recovery was allowed the money or other things were transferred in contemplation of marriage in the sense that they were to be used by the parties after marriage.

*Nicholson*, 855 A.2d at 101-102 (internal citations omitted; emphasis in original). The Reporter's Notes to Section 58 also provide that "[i]t is suggest[ed] that gifts of considerable size may be assumed to be conditional, that other gifts not involving peculiar features, such as heirlooms, and not for the primary purpose of being used after marriage by the parties, should be

regarded as absolute and should be incapable of recovery." Restatement (First) of Restitution § 58, Reporter's Notes. Additionally, in affirming this court's decision in *Lindh*, our supreme court adopted a no-fault approach to gifts given in contemplation of marriage which requires such a gift to be returned to the donor regardless of who was at fault for ending the relationship. *Lindh*, 742 A.2d at 647.

The facts of this case are similar to those in *Nicholson*, *supra*. There, Nicholson and Johnston, intending to marry, purchased a home as joint tenants with the right of survivorship. *Nicholson*, 855 A.2d at 98. Johnston supplied the down payment and closing costs and agreed to be financially responsible for the mortgage. The marriage never occurred. Nicholson filed a partition action and litigation ensued. This court ultimately affirmed the trial court's finding that Johnston's down payment constituted a conditional gift contingent upon the occurrence of the marriage, and because the marriage did not occur, Johnston was entitled to recover the down payment. *Id.* at 101.

Here, Megan contends that the execution of the gift letters constituted a waiver by Joseph that his gift of $52,000 toward the purchase of the Home was conditioned on marriage because the gift letters that they signed state that "no repayment is expected or implied." (Megan's brief at 16-17.)

By their very nature, however, gifts are given without the expectation of repayment. *See Black's Law Dictionary*, 709 (8th ed.) (defining a "gift"

as "[t]he voluntary transfer of property to another without compensation"); **see also** Restatement (First) of Restitution § 58, Reporter's Notes (explaining that donor of gift made in reliance on creation of a relation, manifesting no expectation of repayment, is entitled to restitution if the relation is not entered into even though donor had no such condition in mind). Indeed, Joseph testified that at the time he transferred the funds, he did not expect to be repaid because he "felt [he and Megan] were going to live in the [Home] forever. Get married and have a great life." (Notes of testimony, 12/20/18 at 18.) Megan echoed Joseph's testimony and stated that when the parties signed the gift letters, she was Joseph's fiancé and that she and Joseph were purchasing the Home because they intended to live together as a married couple. (**Id.** at 97.) Megan and Joseph also consistently testified that the sole purpose of the gift letters was to secure the mortgage loan to buy the Home that they intended to live in together as a married couple. (**Id.** at 18, 33-35, 97, 112.)

The record clearly demonstrates that Joseph made the $52,000 gift for the purpose of purchasing a **marital** residence for him and Megan to live in as husband and wife. The gift letters were necessary to achieve that purpose and did not extinguish the condition upon which the gift was given – the occurrence of marriage. Therefore, when the relationship between Megan and Joseph ended, the gift's purpose could no longer be achieved. Consequently, Joseph was entitled to recover the remaining escrow balance in the amount

J. A21039/19

of $36,297.42 which represented partial reimbursement of his payment of the hand money and down payment needed to purchase the Home.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/6/20