# IN THE COURT OF APPEALS OF IOWA

No. 20-0122
Filed November 4, 2020

**CHRISTINA MYERS,**
       Plaintiff-Appellee,

**vs.**

**MICHAEL J. MYERS and KRISANNE L. MYERS,**
       Defendants-Appellants.
_____

Appeal from the Iowa District Court for Dallas County, Elisabeth Reynoldson, Judge.

A son and his wife appeal the district court's judgment for his mother, allowing recovery of her down payments on their home despite gift letters stating no repayment was expected. **AFFIRMED.**

Amanda L. Green of Takekawa & Green, PLLC, Ankeny, for appellants.

James R. Hinchliff of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

Christina Myers brought an equitable action against her son, Michael, and her daughter-in-law, Krisanne, to recoup $89,900 she paid to help them purchase a larger house.[1] As part of their arrangement, Christina remodeled and lived in the walkout basement. Michael and Krisanne argued Christina had no right to repayment because she signed three gift letters to facilitate Michael securing a mortgage on the house. Those letters stated, "[N]o repayment of this gift is expected or implied in either form of cash or services of the recipient."

The district court ruled for Christina, allowing her to recover the $89,900 in contributions. Michael and Krisanne appeal, contending the gift letters were enforceable contracts prohibiting Christina from recovering the gifted amounts. As part of that claim, they argue the court misapplied the equitable theories of unjust enrichment and promissory estoppel. They also contend the court violated the parol evidence rule by considering extrinsic proof of a prior oral agreement between the parties.

Like the district court, we find the gift letters are not enforceable because their terms do not meet the elements of a contract. That finding means the parol evidence rule does not preclude our consideration of extrinsic evidence surrounding Christina's gift. Applying the proper framework for inter vivos gifts,[2] we affirm.

---

[1] Because the parties share a surname, for clarity we will use their first names in this opinion.

[2] Iowa law recognizes two kinds of gifts: inter vivos and causa mortis. *Vosburg v. Mallory*, 135 N.W. 577, 578 (Iowa 1912). The first takes place during the donor's lifetime and the second at the donor's death. *Id.*

## I. Facts and Prior Proceedings

Christina is the mother of three adult children—Michael, Jennifer, and William. For many years, Christina lived alone in Arizona, working full-time as the co-owner of a dog-boarding business. After being hospitalized twice for serious health issues, she decided it was time to move closer to her children.

In August 2013, Christina sold her business, receiving close to $115,000 in proceeds. Seeking to invest the money, she looked into real estate. Because the market was "volatile" in Arizona, Christina entertained moving to Iowa, where Michael and Krisanne lived with their five children. Knowing Michael and Krisanne resided "in a very small home," Christina offered to use the proceeds from the sale of her business to help them buy a bigger house.[3] She testified she "wanted to give them the opportunity to live in a beautiful home" and "to be with them," calling it a "win/win" situation.

Christina told her friend and former business partner, Margaret Brown, that "she decided to buy a home with Michael, her son, in Iowa." Brown understood that Christina would own one-third of the home. Brown testified that, after hearing Christina's plans, she was "nervous" that her friend would end up wishing she had her own space. Similarly, Christina's niece, Laurie Graham King, testified that, based on conversations with her aunt before the purchase, she believed Christina was "a one-third owner in the home."

---

[3] The parties offered conflicting testimony about whether Christina intended to be a co-owner of the new home. Christina testified it was her understanding she would have a one-third ownership interest in the home. But Michael testified he and his mother never had a conversation about joint ownership.

With the understanding that Christina would help finance the home and live with them, Michael and Krisanne began house-hunting that fall. In December, Michael and Krisanne found a three-story home in Cumming with enough space for their children and Christina. Michael shared the listing with Christina, who was still living in Arizona. The house had a walkout basement—finished with two bedrooms, a bathroom, and a kitchen—which the parties agreed Christina would occupy as her private living quarters. Christina thought the arrangement was fair because the basement constituted nearly one-third of the property's total square footage. Michael referred to the space as a "mother's suite." Because the basement was set up as a recreation room, Christina anticipated making some renovations. She also planned to use the basement's unfinished space as a laundry room.

With that arrangement in mind, Michael and Krisanne made an offer of $490,000 on the Cumming house in January 2014. The seller requested an earnest-money deposit of $1500 at the time of the offer, which Michael paid. A day later, the seller made a counteroffer of $525,000 and requested another $3500 deposit due at acceptance. That same day, Michael accepted the deal and paid the deposit. Although the payments came from his personal bank account, he asked Christina to help pay for the deposits. Of the total $5000 earnest-money payments made by Michael, Christina contributed $4900.[4]

---

[4] At the time of the initial offer, Christina gave Michael $900 for the first earnest-money deposit. Christina transferred another $4000 the same day Michael paid the second earnest-money deposit.

Under the purchase agreement, two things had to occur before the March closing date. First, Michael and Krisanne had to obtain a mortgage by early February. Second, they had to make a down payment of around $105,000, which was twenty percent of the purchase price. As promised, Christina planned to contribute $85,000 from her business-sale proceeds toward the down payment.

Michael applied for a mortgage as the sole borrower.[5] But because Michael was relying on Christina for financial support, he did not qualify for the mortgage on his own. The lender told Michael that Christina needed to submit gift letters memorializing her contributions.[6] The contributions totaled $89,900, including the $900 and $4000 earnest-money payments and the anticipated $85,000 partial down payment. At the lender's request, Michael sent Christina three standardized gift letters, informing her the letters were necessary to obtain the mortgage.[7]

On February 1, February 11, and February 12, 2014, Christina signed three separate gift letters for $900, $85,000, and $4000 respectively. Christina testified she had no direct communications with the mortgage company but did what Michael asked her to do because he was "the hands-on person" with the mortgage.

---

[5] The record shows both Krisanne and Christina had marks on their credit histories that would have limited their abilities to qualify for a mortgage.

[6] Mortgage companies may require a borrower to execute a gift letter as an assurance that money applied to a down payment was not a loan requiring repayment. *See In re Marriage of Piscop*, No. 02-1644, 2003 WL 21543766, at *3 (Iowa Ct. App. July 10, 2003) (rejecting "indication of intent" from "the face of the letter" memorializing gift to wife from her father because letter was assurance to mortgage company and did not mean he intended gift only for daughter).

[7] Michael testified that either the mortgage company or his personal mortgage representative prepared the gift letters. But he did not know which one.

Each gift letter contained the following language:

I/We do hereby certify to the following:

I/We [Christina] have made a gift of [$900, $85,000, $4000] dollars to [Michael] named below, and no repayment of this gift is expected or implied either in the form of cash or future services of the recipient.[8]

Christina wrote an email to Michael with the gift letters attached, saying, "Here you go! I sure must like you a lot to be giving you all this money! 1-4-3."[9] Thanks to the gift letters, Michael obtained a mortgage at a favorable rate. On February 26, Christina sent her final contribution of $85,000 to the Wasker Law Firm in Des Moines to be held in escrow until the closing. The closing took place on March 7.

After moving into the Cumming house, Christina became responsible for one-third of the monthly bills. On the first of every month, Michael and Krisanne sent Christina a recurring reminder to pay around $800 to $900—the amount varying based on property taxes, utilities, and other expenses. Although Michael called the monthly payments "rent," Christina testified she never thought of herself as a renter because she also shared the costs of the mortgage, the homeowner's association fees, and the home warranty. And she paid for major improvements in the basement, including remodeling the kitchen and repairing the bathroom. In

---

[8] A review of cases from other jurisdictions reveals that using this specific language in gift letters to mortgage lenders is common practice. *See, e.g.*, *Osterkamp v. Stiles*, 235 P.3d 178, 191 (Alaska 2010) ("[N]o repayment of this gift is expected or implied either in the form of cash or by future services of the recipient."); *Ver Brycke v. Ver Brycke*, 843 A.2d 758, 762 (Md. 2004) ("[T]here is no obligation, expressed or implied either in the form of cash or future services to repay this sum at any time."); *McGoldrick v. Murphy*, 228 A.3d 272, 279 (Pa. Super. Ct. 2020) ("[N]o repayment is expected or implied.").

[9] Christina testified that 1-4-3 was a "family code standing for I love you." But she also claimed she was being "flip" in the email, and that her son understood the conditions from the context.

the first few months of living there, Christina bought a new refrigerator, microwave, oven, washer, and dryer for her personal use. When asked if she would have made those improvements if she knew she had no ownership interest in the home, she testified: "[M]y expectation was that they were going to carry me out of that place in a coffin. This was my bridge into old age." Michael agreed in his testimony that Christina's plan was to live in that home until her death—"that's how she proposed it to us."

Despite Christina's contributions, her name did not appear in the transfer deed. The deed conveyed the property to "Michael J. Myers and Krisanne L. Myers, husband and wife, as Joint Tenants with full rights of survivorship and not as Tenants In Common." Although Christina acknowledged she was not publicly listed as a co-owner, she believed her $85,000 down payment and her monthly mortgage payments established her one-third ownership of the home.

Tensions flared between the parties in 2017 over the living arrangement. Christina felt like her personal living space was "overrun" by Michael, Krisanne, and the children, contrary to what she had agreed to before moving in. Although the parties tried to reconcile their differences, the situation only worsened.[10] So in April 2018, Christina and Michael began to discuss an "exit strategy."

---

[10] In January 2018, there was a water leak in Christina's bathroom damaging the drywall and the floors. After receiving a "very high" estimate of the repair costs, Christina asked her other son, Will, to renovate her bathroom for less than half the cost. Will's presence in the Cumming house became a major point of contention because of personal conflicts between Michael and Will. The brothers had a serious falling out that February, and Michael has not allowed Will inside their home since.

But that fall, rather than agreeing to an exit plan, Christina sued Michael and Krisanne to recover her contributions and "the full value of her share of their joint property, including her portion of the increased value of the joint property." Shortly after filing the petition, Christina received an eviction notice from Michael and Krisanne. That notice gave her thirty days to vacate the property. But because Christina had nowhere to move, Michael allowed her to stay until she bought her own place in January 2019.

The district court held a two-day trial in October 2019. After considering witness testimony and documentary evidence, the court ordered Michael and Krisanne to repay Christina for her contributions in the amount of $89,900 (plus interest).[11] Michael and Krisanne appeal.

## II. Standard of Review

Because the district court heard this case in equity, our review is de novo. Iowa R. App. P. 6.907. We give weight to the court's factual findings, especially when assessing witness credibility, but they do not bind us. *Newhall v. Roll*, 888 N.W.2d 636, 640 (Iowa 2016) (citing Iowa R. App. P. 6.904(3)(g); *Martin v. Martin*, 720 N.W.2d 732, 735 (Iowa 2006)).

## III. Discussion

### A. Contract Analysis

Michael and Krisanne assert the down payments made by Christina were outright gifts with no obligation of repayment. Despite this assertion, Michael and

---

[11] Because Christina presented no expert testimony that the basement remodeling increased value of the home, the January 2020 ruling did not award her reimbursement for those improvements.

Krisanne spend much of their briefing arguing that we should analyze the "gifts" under contract law. They cite four cases from other jurisdictions to support their claim that the gift letters are enforceable contracts: *In re Douglass*, 413 B.R. 573, 579 (Bankr. W.D. Tex. 2009); *Lewis v. Ikner*, 825 S.E.2d 443, 447 (Ga. Ct. App. 2019); *Long v. Beach*, 529 S.E.2d 901, 902 (Ga. Ct. App. 2000); and *Nazy v. Leonardi*, 2016 IL App (1st) 134044, ¶ 47. Despite their insistence that these cases address "the exact issue at hand," we find these authorities distinguishable and unpersuasive.[12]

An enforceable contract has three elements: (1) offer, (2) acceptance, and (3) consideration. *See Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009) ("It is fundamental that a valid contract must consist of an offer, acceptance, and consideration."); *see also* Iowa Code § 537A.2 (2018) ("All contracts in writing, signed by the party to be bound or by the party's authorized agent or attorney, *shall import a consideration*." (emphasis added)). "Generally, the element of consideration ensures the promise sought to be enforced was bargained for and given in exchange for a reciprocal promise or an act." *Margeson*, 776 N.W.2d at 655. Although Michael and Krisanne claim the gift letters are contracts, they are unable to point to a bargained-for exchange. Because a gift, by its nature, does not contemplate a bargained-for exchange, their position contradicts itself.

---

[12] In three of the cases, the courts did not analyze the gift letters under contract law. *See Douglass*, 413 B.R. at 579 (determining whether elements of inter vivos gift were met); *Long*, 529 S.E.2d at 902 (presuming gift letter was enforceable without discussing elements of a contract); *Nazy*, ¶ 47 (finding insufficient evidence to prove unjust-enrichment claim). The only case that did discuss contract law examined a promissory note, which the court presumed was an "unconditional contract." *Lewis*, 825 S.E.2d at 446.

Like the district court stated: "That Iowa Code § 537A.2 would apply to gift letters is counterintuitive as a written statement that one person is giving another person an unconditional gift is a gratuitous promise—the opposite of a bargained for exchange." Here, the gift letters preclude an exchange of consideration: "[N]o repayment of this gift is expected or implied either in the form of cash or future services of the recipient." Based on that language, we find the gift letters were not valid contracts supported by consideration. Our conclusion aligns with cases from other jurisdictions. *See Kelien v. Kelien*, No. 2019-CA-000045-MR, 2019 WL 5681417, at *2 (Ky. Ct. App. Nov. 1, 2019) (holding gift letter was not contract); *Kinde v. Grzywacz*, No. 281771, 2009 WL 279060, at *2 (Mich. Ct. App. Feb. 5, 2009) (same).

### B. Gift Analysis

Assuming Michael and Krisanne alternatively seek to establish that the down payments were irrevocable gifts, we turn to a gift analysis. Unlike a contract, consideration is not an element of a gift. *Frederick v. Shorman*, 147 N.W.2d 478, 483 (Iowa 1966). A valid inter vivos gift requires proof of three elements: (1) donative intent, (2) delivery, and (3) acceptance. *Gray v. Roth*, 438 N.W.2d 25, 29 (Iowa Ct. App. 1989) (citing *Raim v. Stancel*, 339 N.W.2d 621, 623 (Iowa Ct. App. 1983)). "The intent of the grantor is the controlling element." *Id.* After the donor delivers a gift, it is irrevocable unless the parties agree otherwise. *Fredrick*, 147 N.W.2d at 483. But if there is a condition attached to the delivered gift, the gift fails. *Gray*, 438 N.W.2d at 29.

Here, the only element at issue is donative intent. Michael and Krisanne argue the language in the gift letters reveals Christina's intent to give them the

money without condition. They claim, "Christina had the opportunity to review the gift letters with an attorney or determine that language within the gift letters was not consistent with her alleged agreement with Michael and therefore had the option not to sign the gift letters." They also point to the email Christina sent Michael with the gift letters attached that said: "I must like you a lot to be giving you all this money!"

While granting that evidence, we find ample proof that her gift was not unconditional. To find that a written document meant something different from what the parties expressed in it requires proof by "clear, satisfactory, and convincing" evidence. *Frederick*, 147 N.W.2d at 484. To meet that test, "it is merely necessary that there be no serious or substantial doubt about the correctness of the conclusion drawn from it." *Raim*, 339 N.W.2d at 624. Christina's evidence met that standard.

The record shows Christina was a single mother who was concerned about her health and retirement. She testified that her two motivations for moving to Iowa were to be with family and to invest her savings in a home. Christina was consistent throughout the trial that she believed she had a one-third ownership in the Cumming house because she contributed a substantial share of the down payment. She also paid one-third of the monthly mortgage bill from the closing in March 2014 (though she did not move to Iowa until 2015) until she moved out in January 2019. Although Michael insists the monthly payments were "rent," the record reveals he had no rental agreement with his mother, and he did not claim

any rental income on his 2015 to 2019 federal tax returns during the time Christina lived in the home.[13]

As to the gift letters, Christina acknowledged she read the relevant language before signing. But she credibly testified she was only doing Michael's bidding because the lender required the gift letters to issue him the mortgage. The district court found: "At the time Christina signed the letters, she had no expectation of repayment as she expected to remain living in the house until her death or its sale." The court also found: "Michael agreed that he received the money on the condition that Christina would continue to live there." Even in our de novo review, we give considerable weight to the district court's fact findings because the judge heard live testimony, and we have only the cold transcript from which to assess credibility. *See In re Marriage of Woodward*, 228 N.W.2d 74, 75 (Iowa 1975).

We agree with the district court that once the parties decided Christina would no longer live in the house, she could not achieve the gift's purpose. The circumstances here are much like a Pennsylvania case, where the appellate court held that a donor could recover partial reimbursement from his former fiancé of his down payment on the house they intended to be their marital residence. *McGoldrick*, 228 A.3d at 279. The court awarded relief despite the donor signing gift letters that stated no repayment was "expected or implied" when the fiancé was applying for the mortgage. *Id.* "The gift letters were necessary to achieve that purpose and did not extinguish the condition upon which the gift was given—the occurrence of marriage." *Id.* Here, Christina offered convincing evidence that the

---

[13] Michael and Krisanne owned a separate rental property for which they did report receiving rental payments for tax purposes.

condition of the gift was her residing in her son's household.  The language of the gift letters did not extinguish that condition.[14]

Considering Christina's evidence, we cannot conclude the gift letters resolved her intent to make an unconditional gift.[15]  Instead, we find clear and convincing evidence that Christina contributed to the down payment on the house based on a broader agreement with Michael and Krisanne that she be able to keep living with them until her death.

---

[14] We understand that banks rely on gift letters "every day when making lending decisions."  *See In re Felsner*, 289 Fed. Appx. 879, 887 (6th Cir. 2008) (McKeague, J., dissenting).  That reliance is not the question before us.  Instead, we are constrained to considering whether the limited language of the letters signed by Michael and Christina forecloses Christina's recovery on her equitable theories.  The letters stated Christina had no expectation that Michel would repay the gift amounts in the form of cash or future services.  The letters did not address their expectation that Christina would live in the house as a condition of the gift.

[15] Courts from other jurisdictions share this view of gift letters.  For instance, a Texas appellate court held:

> [T]he Gift Letter merely stated that no repayment was "expected or implied in the form of cash or by future services to the recipient."  The evidence established that, at the time [Huntress—an ailing octogenarian] made the down payment on the Property, it was made in exchange for the [son and daughter-in-law's] promises to allow her to live there.  Thus, even though she did not expect repayment or future services from the Douglasses as long as they complied with the agreement, the trial court could conclude that the down payment was not an unconditional gift, even in light of the Gift Letter.

*Douglass v. Huntress*, No. 06-17-00103-CV, 2018 WL 4224898, at *8 (Tex. Ct. App. Sept. 5, 2018) (upholding jury's award under breach-of-oral-contract theory).  Similarly, a Massachusetts appeals court decided that gift letters executed by an aging aunt did not preclude repayment by her nephew and his wife.  *See Bryant v. Cribbie*, No. 09-P-1421, 2010 WL 1064467, at *2 (Mass. Ct. App. Mar. 25, 2010).  The court held:

> A fact finder could determine that both letters were executed well after the time the parties came to their understanding and could infer from the circumstances of the writings as well as the content of the letters that Bryant was not expecting repayment of the money, as the letters state, but that she nonetheless expected that the Cribbies would provide her a place to live for her lifetime.

*Id.*

### C. Parol Evidence Rule for Inter Vivos Gifts

We next address whether considering extrinsic evidence beyond the written gift letters violates the parol evidence rule. Michael and Krisanne challenge the district court's finding that the parol evidence rule did not apply to gift letters. But their argument turns on "the existence of an enforceable written agreement." As stated previously, no such agreement exists on this record.

To start, the parol evidence rule is not a rule of evidence but a rule of substantive contract law. *Salsbury v. Nw. Bell Tel. Co.*, 221 N.W.2d 609, 611 (Iowa 1974). It bars the use of extrinsic evidence of prior or contemporaneous agreements or negotiations to contradict a clear and unambiguous written agreement. *See Garland v. Brandstad*, 648 N.W.2d 65, 69 (Iowa 2002) (citing Restatement (Second) of Contracts § 215, at 136 (1981)). Although the parol evidence rule applies to written contracts, we find no Iowa authority invoking it for gift letters.[16] Because we determined the gift letters were not valid contracts between Michael and Christina due to lack of consideration, the parol evidence rule does not apply here. *See Kelien*, 2019 WL 5681417, at *3 (concluding court properly considered extrinsic evidence to determine scope and nature of a gift letter because it was not a contract); *see also Williams v. Havey*, No. 3:16-CV-64, 2016 WL 4543482, at *3 (M.D. Tenn. Aug. 29, 2016) ("Even assuming that the Gift Letter is capable of creating a binding contract, the parties do not agree that the Gift Letter embodies their final agreement.").

---

[16] The parol evidence rule also applies to wills. *In re Kalouse's Estate*, 282 N.W.2d 98, 104–05 (Iowa 1979) ("[E]xtrinsic evidence is not admissible to vary, contradict or add to the terms of the will, or to show a different intention on the part of the testator from that disclosed by the language of the will.").

Instead, to determine the scope of permissible evidence, we seek guidance from the Restatement (Third) of Property: Wills and Other Donative Transfers. *See In re Coe College*, 935 N.W.2d 581, 590 (Iowa 2019) (favorably discussing this Restatement). Section 10.2 states: "In seeking to determine the donor's intention, all relevant evidence, whether direct or circumstantial, may be considered, including the text of the donative document *and relevant extrinsic evidence*." Restatement (Third) of Property: Wills and Other Donative Transfers § 10.2 (Am. L. Inst. 2003) (emphasis added). The comments to the section are particularly relevant here: "Extrinsic evidence of the circumstances surrounding the execution of the donative document that might bear on the donor's intention, directly or circumstantially, may always be considered." *Id.* § 10.2 cmt. d. We may also consider "the donor's own declarations of intention" through documents and testimony. *Id.* § 10.2 cmt. f.

Applying this framework, we are not prohibited from considering evidence beyond the gift letters, such as the witness testimony and exhibits presented at the trial. The district court committed no error in considering the prior oral agreement between the parties to aid its determination of Christina's donative intent. Upon our de novo review of all the evidence, we conclude Christina gave Michael and Krisanne the down payments as a gift subject to a prior oral condition that she would reside in the home with a financial stake in the property.

### D.     Unjust Enrichment

The equitable doctrine of unjust enrichment reflects the principle "that one party should not be unjustly enriched at the expense of another party." *Endress v. Iowa Dep't of Human Servs.*, 944 N.W.2d 71, 80 (Iowa 2020). Although often

called a quasi-contract theory, unjust enrichment "is not grounded in contract law but rather is a remedy of restitution." *Iowa Waste Sys., Inc. v. Buchanan Cnty.*, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000). The party seeking restitution damages may recover up to the value of what was unjustly retained. *Id.* at 30. For inter vivos gifts, a grantor may recover a gift if it was subject to a condition that was not fulfilled. *See Fierro v. Hoel*, 465 N.W.2d 669, 671 (Iowa Ct. App. 1990).

We agree with the district court's conclusion: "As the condition upon which the money was given no longer exists, Christina is entitled to repayment." Thus, to prevent Michael and Krisanne from being unjustly enriched at her expense, Christina was entitled to repayment of her $89,900 in contributions.

### E. Promissory Estoppel

Our supreme court has identified four elements of promissory estoppel:

> (1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Kunde v. Estate of Bowman*, 920 N.W.2d 803, 810 (Iowa 2018) (quoting *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 49 (Iowa 1999)). A claim of promissory estoppel focuses on the elements of "a promise and reliance, rather than agreement and consideration." *Id.* Christina met these elements. At the two-day trial, she offered evidence that (1) Michael and Krisanne promised her a return on her investment in the down payment of the home, (2) it was clear to Michael that Christina was relying on the promise before she paid $89,900 and moved into the home, (3) she reasonably relied on the promise to her financial detriment, and

(4) injustice can be avoided only by awarding recovery to the value of her contributions.    A promissory-estoppel claim likewise supports Christina's recovery.[17]

**AFFIRMED.**

---

[17] Because we agree with Christina's recovery under the theories of unjust enrichment and promissory estoppel, we need not address the court's rejection of her claim for equitable partition.